NEWBURY COMMONS LIMITED PARTNERSHIP *v.*
CITY OF STAMFORD
(14579)

CALLAHAN, BORDEN, BERDON, NORCOTT and KATZ, Js.

Argued February 8—decision released June 22, 1993

*Alice L. Perry,* assistant corporation counsel, with whom, on the brief, was *Daniel M. McCabe,* corporation counsel, for the appellant (defendant).

*Michael J. Cacace,* with whom was *Paul T. Tusch,* for the appellee (plaintiff).

NORCOTT, J. The principal issue in this appeal is whether the trial court improperly reduced an assessment on the plaintiff's real property by adopting an appraisal methodology that was invalid as a matter of law. The plaintiff, Newbury Commons Limited Partnership, brought an action against the defendant, the city of Stamford, pursuant to General Statutes (Rev. to 1989) § 12-118,[1] requesting a reduction of the assess-

---

[1] General Statutes (Rev. to 1989) § 12-118 provides: "APPEALS FROM BOARDS OF TAX REVIEW. Any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, claiming to be aggrieved by the action of the board of tax review in any town or city may, within two months from the time of such action, make application, in the nature of an appeal therefrom, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by

ment on its real property for the tax years 1987, 1988, 1989 and 1990. The trial court found that the assessment of the plaintiff's property was excessive and reduced the assessed value to the amount reflected in the appraisal report of the plaintiff's expert.[2] The

a citation to such town or city to appear before said court. Such citation shall be signed by the same authority and such appeal shall be returnable at the same time and served and returned in the same manner as is required in case of a summons in a civil action. The authority issuing the citation shall take from the applicant a bond or recognizance to such town or city, with surety, to prosecute the application to effect and to comply with and conform to the orders and decrees of the court in the premises. Any such application shall be a preferred case, to be heard, unless good cause appears to the contrary, at the first session, by the court or by a committee appointed by the court, and the pendency of such application shall not suspend an action by such town or city to collect not more than seventy-five per cent of the tax so assessed or not more than ninety per cent of such tax with respect to any real property for which the assessed value is five hundred thousand dollars or more, and upon which such appeal is taken. If, during the pendency of such appeal, a new assessment year begins, the applicant may amend his application as to any matter therein, including an appeal for such new year, which is affected by the inception of such new year and such applicant need not appear before the board of tax review to make such amendment effective. The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable, and, if the application appears to have been made without probable cause, may tax double or triple costs, as the case appears to demand; and, upon all such applications, costs may be taxed at the discretion of the court. If the assessment made by the board of tax review is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes, together with interest and costs, or, at the applicant's option, shall be granted a tax credit for such overpayment, interest and costs. Upon motion, said court shall, in event of such overpayment, enter judgment in favor of such applicant and against such city or town for the whole amount of such overpayment, together with interest and costs. The amount to which the assessment is so reduced shall be the assessed value of such property on the grand lists for succeeding years until the tax assessor finds that the value of the applicant's property has increased or decreased." See also Public Acts 1989, No. 89-231, § 4, and Public Acts 1990, No. 90-266, § 4.

[2] The trial court also ordered that the defendant was entitled to offset the credit to which the plaintiff was entitled for overpayment of taxes by the amount of interest it was owed by the plaintiff on sewer taxes for which the defendant had counterclaimed and had received a judgment. This part of the trial court's judgment was not challenged on appeal.

defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm.

The following facts are undisputed. The plaintiff is the owner of a twin tower building located in Stamford consisting of 260 rental apartment units and approximately 10,000 square feet of commercial space with a health club. Construction of the building was completed in 1986, and the last revaluation of real property in Stamford at the time relevant to this appeal occurred on October 1, 1981.[3] Therefore, the tax assessment for the years 1987 through 1990 required that an assessed value of the property as of October 1, 1981, be established.

Pursuant to the provisions of General Statutes § 12-53a,[4] the defendant's assessor established a fair market value for the property of $23,463,610, which resulted in an assessment of $16,424,530 for the 1987 list.[5] This assessment was increased for 1988 and 1989 due to further improvements to the building. The plaintiff appealed to the Stamford board of tax review for a reduction of the assessments, and to the trial court after the board affirmed the assessments.

[3] The next Stamford revaluation was expected to be completed for the October 1, 1991 list.

[4] General Statutes § 12-53a provides in relevant part: "(a) Completed new construction of real estate completed after any assessment date shall be liable for the payment of municipal taxes from the date the certificate of occupancy is issued or the date on which such new construction is first used for the purpose for which same was constructed, whichever is the earlier, prorated for the assessment year in which the new construction is completed. Said prorated tax shall be computed on the basis of the rate of tax applicable with respect to such property, including the applicable rate of tax in any tax district in which such property is subject to tax following completion of such new construction, on the date such property becomes liable for such prorated tax in accordance with this section."

[5] The assessment represents 70 percent of the fair market value of the property in accordance with General Statutes § 12-62a (d).

At trial, the court heard testimony from three expert witnesses regarding the 1981 value of the property: Frank Kirwin, the defendant's assessor; George Derderian, an independent appraiser retained by the defendant; and Ronald Glendinning, the plaintiff's appraiser. All of the experts agreed as to generally accepted appraisal techniques. No one had appraised the property through the use of comparable properties, however, because no comparables were available. Each expert used a different methodology for establishing a 1981 fair market value for the property,[6] and each arrived at a different corresponding value for assessment purposes: Kirwin assessed the property at $16,424,530; Derderian's assessment was $15,050,000; and Glendinning's assessed value was $5,810,000.

The trial court concluded that the assessments on the plaintiff's property for the years 1987 through 1990 were excessive and inequitable and that the defendant had failed to follow General Statutes § 12-63b[7] because

---

[6] Kirwin testified that he had employed the cost method based upon building cost schedules from 1981 to establish a fair market value. Derderian had employed the cost and income approaches to establish a 1987 fair market value and then trended back this value to 1981 using the Boeckh Cost Manual, a manual for estimating labor and construction costs. Glendinning employed an income approach, the discounted cash flow method, to establish a 1991 fair market value, which he then trended back to 1981 using a sales/assessment ratio.

[7] General Statutes § 12-63b provides in relevant part: "VALUATION OF RENTAL INCOME REAL PROPERTY. (a) The assessor or board of assessors in any town, when determining the present true and actual value of real property as provided in section 12-63, which property is used primarily for the purpose of producing rental income, exclusive of such property used solely for residential purposes, containing not more than six dwelling units and in which the owner resides, and with respect to which property there is insufficient data in such town based on current bona fide sales of comparable property which may be considered in determining such value, shall determine such value on the basis of an appraisal which shall include to the extent applicable with respect to such property, consideration of each of the following methods of appraisal: (1) Replacement cost less depreciation, plus the market value of the land, (2) the gross income multiplier method as used for similar property and (3) capitalization of net income based on market rent for similar property."

its assessor had relied on only a cost method to establish an assessment value. The trial court also concluded that the assessment values proffered by Kirwin and Derderian were questionable because each had used an appraisal method that the court considered inappropriate for the determination of the 1981 assessed value.[8] The court further stated that "[t]he appraisal report and the testimony submitted by the plaintiff's expert, Ronald Glendinning, was a thorough, accurate and credible piece of work and testimony. . . . The conclusions of Mr. Glendinning as to a 1981 fair market value of $8,300,000.00 and a 1981 assessment of [$5,810,000.00] are accepted by this court." The court then ordered that the plaintiff's assessment be reduced to $5,810,000 for the years in question, and that the plaintiff be granted a tax credit for all overpayment of taxes on previous assessments.

---

[8] The trial court's memorandum of decision stated: "Mr. Kirwin, the City's assessor, testified that the City did not use the comparable or income methods of valuing the subject property. The City used only the cost approach. Mr. Kirwin conceded that a reasonable purchaser would not base an offer to purchase a property like Newbury Commons solely on a cost appraisal basis. The valuation method adopted by the assessor for the subject property, therefore, would not produce a price at which a willing buyer and a willing seller would agree to transfer this property. The assessment of the property established by the City is not based on the true value as value is defined by the assessor himself. . . .

"The validity of the assessment placed on the Newbury Commons property by the City is likewise challenged by reference to the appraisal submitted by the City's appraiser Derderian . . . . The City's own appraiser believes that the assessed value established by the City's assessor is incorrect by almost $1,500,000.00.

"As to Mr. Derderian's appraisal, he purports to have established a 1987 valuation of the property. He then trended back the value from 1987 to 1981 using Boeckh's Building Costs Index Numbers ('Boeckh'). Mr. Derderian indicated at trial that Boeckh's is not used to determine the difference over time for the valuation of land, that it does not reflect changes in income flow from real estate, and that it would not have accurately shown the increase in value of land from 1981 to 1987. He did, however, use it for those three purposes."

The defendant claims on appeal that the trial court improperly reduced the assessment on the plaintiff's property to the value determined by the plaintiff's expert. The defendant argues that the appraisal methodology employed by the plaintiff's expert effectively granted an interim revaluation of the property and therefore should have been rejected by the trial court as a matter of law.[9] Many of the defendant's arguments regarding this methodology are essentially factual, and recount the evidence and arguments presented at trial. The defendant also recounts at length the testimony of its own appraisers and argues that the trial court arbitrarily rejected this testimony. It is not the province of this court to retry the facts. *Robert Lawrence Associates, Inc.* v. *Del Vecchio,* 178 Conn. 1, 13, 420 A.2d 1142 (1979). We, therefore, address the defendant's claim as: (1) whether the trial court improperly accepted the appraisal of the plaintiff's expert to establish value because that appraisal was invalid as a matter of law; and (2) whether, based on the evidence presented at trial, the trial court's finding that the defendant's assessment was excessive was clearly erroneous.

I

The defendant claims that the appraisal method employed by the plaintiff's expert, Glendinning, in effect granted the plaintiff an interim revaluation by taking account of the economic downturn of the late 1980s. Therefore, the defendant claims, the plaintiff's appraisal violated the equalization requirement of

[9] The defendant argues, with respect to Glendinning's appraisal, that: (1) it valued the property as of 1991 for the purpose of incorporating the economic downturn of the late 1980s; (2) it used an impermissible methodology, the sales/assessment ratio, to trend back the 1991 value to a 1981 value; (3) it used an erroneous mill rate formula that further reduced the value of the property; and (4) it failed to use available 1980 and 1981 market data.

General Statutes (Rev. to 1981) § 12-62[10] and should have been rejected by the trial court as a matter of law.[11]

It is well established that "[i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony." *Kimberly-Clark Corporation* v. *Dubno,* 204 Conn. 137, 153, 527 A.2d 679 (1987). The credibility and the weight of expert testimony is judged by the same standard, and the trial court "is privileged to adopt whatever testimony he reasonably believes to be credible." (Internal quotation marks omitted.) *Transportation Plaza Associates* v. *Powers,* 203 Conn. 364, 378, 525 A.2d 68 (1987). On appeal, we do not retry the facts or pass on the credibility of witnesses. *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.,* 207 Conn. 468, 473, 542 A.2d 692 (1988).

The trial court was presented with conflicting testimony as to the value of the property, and concluded that the report and testimony of the plaintiff's expert was the most credible. In any assessment case in which

---

[10] General Statutes (Rev. to 1981) § 12-62 provides in relevant part: "(a) Commencing October 1, 1978, the assessors of all towns, consolidated towns and cities and consolidated towns and boroughs shall, no later than ten years following the last preceding revaluation of all real property and every ten years after each such revaluation, view all of the real estate of their respective municipalities, and shall revalue the same for assessment and, in the performance of these duties, except in any municipality where there is a single assessor, at least two of the assessors shall act together, and all valuations shall be separately approved by a majority of the assessors."

[11] The defendant also argues that the appraisal should not have been admitted into evidence because it was irrelevant. The defendant asserts that, because the plaintiff's appraisal purports to establish a fair market value as of 1991, it was irrelevant to the issue of fair market value on October 1, 1981. The trial transcripts clearly reflect that the plaintiff's appraisal used a 1991 fair market value as a starting point, but then ultimately made a determination as to value in 1981. The plaintiff's expert testified before the trial court that his report represented a determination of a 1981 assessment value. We therefore conclude that this argument of the defendant is without merit.

the trial court is confronted with conflicting appraisal methods, it is a proper function of the court to give credence to one expert over the other. *Connecticut Coke Co.* v. *New Haven,* 169 Conn. 663, 666, 364 A.2d 178 (1975). The conclusions reached by the trial court must stand "unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law."(Internal quotation marks omitted.) *Hartford* v. *Tucker,* 15 Conn. App. 513, 517–18, 545 A.2d 584, cert. denied, 209 Conn. 807, 548 A.2d 444 (1988). We will not disturb the trial court's adoption of the plaintiff's valuation of the property, therefore, unless the appraisal was legally invalid.

At trial, the plaintiff's expert explained that he had used a discounted cash flow method to obtain the fair market value of the property for 1991. Despite the defendant's contention to the contrary, the 1991 valuation was only a "starting point" to a determination of a 1981 assessment value.[12] The discounted cash flow method is an accepted method for determining the present value of real property. The Appraisal of Real Estate (10th Ed. 1992) pp. 420–21; Dictionary of Real Estate Appraisal (2d Ed. 1984) p. 94.

The plaintiff's expert then testified that, to obtain an assessed value for 1981, he employed an average ratio of sale price to assessments to trend back the 1991

---

[12] As part of his determination of a 1991 fair market value, the plaintiff's expert calculated costs on the assumption that there would be no revaluation during the period reflected by the model and therefore that the mill rate would continue to increase. The defendant argues that, because the mill rate generally drops after a revaluation is performed, this formula resulted in an impermissible assessment reduction because it presumes seventeen years of straight ascendency in the mill rates. The defendant's argument in this regard completely misconceives the purpose of the straight ascendency of the mill rates as explained by the plaintiff's expert at trial. We find no basis in the record for a finding that this procedure was invalid as a matter of law.

value to 1981.[13] The defendant argues that this method of appraisal is impermissible because it effectively gives the plaintiff an interim revaluation because the average ratio accounts for market conditions during the applicable time period, which in this case was from 1981 to 1991. We have previously recognized, however, that the use of an average ratio of sales to assessments is acceptable to establish the unfairness of an assessment and to provide a remedy once a finding of an inequitable and excessive assessment has been made. *Uniroyal, Inc.* v. *Board of Tax Review,* 182 Conn. 619, 626, 438 A.2d 782 (1981); *Kays, Inc.* v. *Board of Tax Review,* 170 Conn. 477, 481, 365 A.2d 1207 (1976); *Lerner Shops, Inc.* v. *Waterbury,* 151 Conn. 79, 90, 193 A.2d 472 (1963).

In *Uniroyal, Inc.* v. *Board of Tax Review,* supra, 626, we noted that "use of the average ratio approach is not a supplement to fair valuation as mandated by [General Statutes § 12-64] . . . ." We acknowledged, however, that where a claim is made that an assessor had failed to establish a fair valuation, "[t]he average ratio technique is useful both as evidence of, and as a remedy to cure, a failure of the assessing authority to follow equitable procedures or the statutory requirements,

---

[13] Although at trial the plaintiff's expert referred to this ratio as the "effective ratio," the plaintiff conceded at oral argument and in its brief that the effective ratio is the same as the sales/assessment ratio, or average ratio as we have referred to it in prior cases. See, e.g., *Uniroyal, Inc.* v. *Board of Tax Review,* 182 Conn. 619, 438 A.2d 782 (1981). The plaintiff's expert explained at trial that the sales/assessment ratio is the ratio of the assessment value of property to its sale price. Although by statute it is presumed that the assessed value is 70 percent of the fair market value, over time this percentage will decrease or increase depending on whether a sale occurs during a year in which the market is rising or falling. The Connecticut office of policy and management keeps records of this data and determines a sales/assessment ratio every year that reflects the ratio of cumulative assessments in a given town to the cumulative sales. The plaintiff's expert testified that by applying the proper ratio he was able to trend the 1991 fair market value back to the 1981 assessed value.

or to correct its clear error." Id., 630–31 n.7. It was therefore proper for the trial court to consider the assessment of the plaintiff's expert as evidence that the defendant's assessment did not reflect a fair valuation as required by statute and to adopt that assessment as its own finding of the true and actual value of the property once it had found the defendant's assessment to be inequitable and excessive.[14]

We also conclude that the assessment of the plaintiff's expert did not grant the plaintiff an impermissible interim revaluation or violate the equalization requirement of General Statutes § 12-62. The plaintiff did not seek an adjustment to its real property tax assessment due to market fluctuations; see *Ralston Purina Co.* v. *Board of Tax Review,* 203 Conn. 425, 525 A.2d 91 (1987); rather, it challenged the 1981 assessed

---

[14] The defendant also claims that the use of an average ratio is only acceptable if a violation of General Statutes § 12-64 has been established and, therefore, that it was improper to use in this case because the trial court had found only a violation of General Statutes § 12-63b. We need not decide whether the average ratio technique is limited to violations of § 12-64, as opposed to any illegality in assessment practices, because the record in this case did establish such a violation.

Section 12-64 provides that all nonexempt real estate "shall be liable to taxation at a uniform percentage of its present true and actual valuation . . . ." "The three steps necessary to carry out the mandate of § 12-64 are: (a) The fair value of the property as of the assessment date must be determined. (b) A percent, not exceeding 100 percent, of the fair value, must be determined by the assessing authority for uniform application to all property within the town. (c) The assessment value, i.e., the value for the purpose of taxation, for any given piece of property in the town, must be ascertained by applying the determined uniform percent to its fair value as of the assessment date." (Internal quotation marks omitted.) *Uniroyal, Inc.* v. *Board of Tax Review,* 182 Conn. 619, 623, 438 A.2d 782 (1981).

Relief under General Statutes § 12-118, as the plaintiff requested in this case, is conditioned upon proof of failure to comply with § 12-64. Id., 627. We conclude that the trial court's finding that the defendant's assessment was excessive and inequitable, thereby warranting relief under § 12-118, was a finding that the defendant had violated the statutory duty under § 12-64 to determine "the fair value of property as of the assessment date," although § 12-64 was not expressly cited by the court.

value determined by the defendant as being excessive. The evidence presented at trial clearly established that the first assessment of the property was in 1987 pursuant to General Statutes § 12-53a and that all parties agreed that the assessment of the property had to relate back to the last revaluation date, 1981.

The plaintiff's expert employed a legally permissible method to obtain a 1981 assessed value. We see no basis for disturbing the discretion of the trial court to adopt this assessment as the true and actual value of the plaintiff's property. We conclude, therefore, that the trial court could properly have credited the appraisal and testimony of the plaintiff's expert and properly adopted the plaintiff's assessment as the true and actual value of the property.

## II

The defendant also claims that the trial court's conclusion that the defendant's assessment of the plaintiff's property was excessive and inequitable was clearly erroneous.[15] We disagree.

Whether a property has been overvalued for tax assessment purposes is a question of fact for the trier.

---

[15] The defendant also seems to argue that the trial court improperly concluded that the defendant had violated General Statutes § 12-63b. The trial court based this finding on the fact that, because the defendant's assessor had used only the cost method of appraisal, he had not complied with § 12-63b, which provides that the assessor for this type of property shall "include to the extent applicable with respect to such property, consideration of *each* of the following methods of appraisal: (1) Replacement cost less depreciation, plus the market value of the land, (2) the gross income multiplier method as used for similar property and (3) capitalization of net income based on market rent for similar property." (Emphasis added). The testimony of the defendant's assessor was clear on the fact that he had simply applied the replacement cost method because he had always determined value that way, and that he had not considered the statute and had not used either the gross income multiplier or the capitalization of net income methods. We conclude that, on this record, there is no basis for finding that the trial court's determination on this issue was improper.

*Connecticut Savings Bank* v. *New Haven,* 131 Conn. 575, 584, 41 A.2d 765 (1945). General Statutes (Rev. to 1989) § 12-118 provides that "[t]he court shall have power to grant such relief as to justice and equity appertains . . . ." "Mere overvaluation is sufficient to justify redress under § 12-118, and the court is not limited to a review of whether an assessment has been unreasonable or discriminatory or has resulted in substantial overvaluation. . . . The court . . . exercise[s] a broad discretionary power to grant relief. . . . If a taxpayer is found to be aggrieved by the decision of the board of tax review, the court tries the matter de novo and the ultimate question is the ascertainment of the true and actual value of the [plaintiff's] property." (Citations omitted). *O'Brien* v. *Board of Tax Review,* 169 Conn. 129, 130–31, 362 A.2d 914 (1975).

In this case, the trial court heard the testimony of three expert appraisers who each testified to a different assessment value for the property. The court heard testimony from each as to the different appraisal methods employed by them and their justifications for using the selected method. The plaintiff's expert offered an assessed value that was substantially less than those of the defendant's appraisers, and through extensive direct and cross-examination, explained that the unique nature of the property made his approach rational and reasonable.

The defendant's assessor testified that he had employed only a cost approach to value the property and that this method would not produce a value that a willing buyer would use to make an offer to a willing seller. The plaintiff's expert testified that, owing to the unique nature of the property, use of the cost method to determine value would be unreasonable and invalid. The defendant's other expert appraiser, Derderian, testified that he had used a cost and income approach to value the property and then had trended that value back

using Boeckh's Building Costs Manual. As the trial court noted, however, Derderian also testified that Boeckh's Manual was not generally used to determine the changes in value of land and income flow, which is what he nonetheless had used it to measure.

The trier of fact "arrives at his own conclusions as to the value of land by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value . . . ." *O'Brien* v. *Board of Tax Review,* supra, 136. Other than its claim that the trial court should not have rejected the assessment offered by its assessor, the defendant has offered no basis for a conclusion that the court's finding that the assessment was excessive was clearly erroneous. After reviewing the record, we are persuaded that the trial court's decision was firmly based in the evidence.

The judgment is affirmed.

In this opinion the other justices concurred.