[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This tax appeal was returned to court on April 18, 1995. It involves an appeal from a decision of the Board of Tax Review of the Town of North Haven, Connecticut, regarding property owned by the applicant United Technologies Corporation, on October 1, 1994. This property is commonly known as the Pratt Whitney Airfoils Product Center, 409 Washington Avenue, North Haven, Connecticut.
The defendant filed a responsive answer of May 11, 1995. This answer admitted that applicant owned this property on October 1, 1994 and that the assessors valued the property on that date in the amount of $88,306,029.00 and determined that the property should be assessed for taxation at $61,814,220 or 70 per cent of its true and actual valuation on that date. The answer denied that the valuation of this property placed thereon by the assessors was not that percentage of its true and actual value on that assessment date but was grossly excessive, disproportionate CT Page 14339 and unlawful.
In paragraph 5 of its complaint, the plaintiff alleged that it duly appealed to the Board of Tax Review of the Town claiming to be aggrieved by the action of the assessors and offered to be sworn and answer all questions concerning the property, but the board made no change in the valuations. The defendant answered paragraph 5 indicating that it lacked sufficient information or knowledge with which to admit or deny these allegations and therefore leaves the plaintiff to its proof.
In this appeal plaintiff asks the court to reduce the valuation of this property on October 1, 1994 to its true and actual value as of October 1, 1991.
The court has jurisdiction to hear appeals of this type pursuant of § 12-117a of the General Statutes. The statute grants the court power to grant to an aggrieved taxpayer such relief as to justice and equity appertains. If the court reduces the assessment, the amount to which the assessment is reduced shall be the assessed value of such property on the grand lists for succeeding years until the tax assessor finds the value of the applicant's property has increased or decreased.
In following the dictates of § 12-117a, the court must be guided by § 12-63 of the General Statutes which provides in relevant part: "The present true and actual value of . . . property shall be deemed by all assessors and boards of tax review to be the fair market value thereof and not its value at a forced or auction sale." "True and actual value is synonymous with "market value, actual value, fair market value, market price and fair value . . ." Uniroyal, Inc. v. Board of Tax Review, 182 Conn. 619,623 n. 3 (1981).
"Fair market value" is defined as "the value that would be fixed in fair negotiations between a desirous buyer and a willing seller, neither under any undue compulsion to make a deal.Uniroyal, Inc. v. Board of Tax Review, 174 Conn. 380, 390 (1978). Fair market value "is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use." Connecticut Printers, Inc. v. Redevelopment Agency,159 Conn. 407, 411.
The trial court in a § 12-117a appeal hears the case de CT Page 14340 novo, Stamford Apartments Co. v. Stamford, 203 Conn. 586, 588
(1987) and "has the right to accept so much of the testimony of the experts and recognized appraisal methods which they employed as [it] finds applicable. . ." Stamford Apartments Co. v.Stamford, supra, 594.
Section 12-63b of the General Statutes recognizes three methods of appraisal of rental income property for tax purposes.
 (1) replacement cost less depreciation, plus the market value of the land;
 (2) the gross income multiplier method as used for similar property;
 (3) capitalization of net income based on market rent for similar property.
Case law, Second Stone Ridge Cooperative Corp. v. Bridgeport,220 Conn. 335, 342 (1991) expands the list of methods which are suitable for determining the fair market value of property for taxation purposes to include the analysis of comparable sales. In a given situation, one method may be given greater weight than another but regardless "[T]he process of estimating the value of property for taxation is, at best, one of approximation and judgment, and there is a margin for a difference of opinion."Burritt Mutual Savings Bank v. New Britain, 146 Conn. 669, 675
(1959).
In an appeal pursuant to § 12-117a, the plaintiff taxpayer bears the burden of proving both aggrievement and over assessment, Gorin's, Inc. v. Board of Tax Review of Town ofWaterbury, 178 Conn. 606 (1979). It is a question of fact for the factfinder whether the property has been overvalued. NewburyCommons Ltd. Partnership v. City of Stamford, 226 Conn. 92
(1993). [I]n a case tried before the court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony." Kimberly-ClarkCorporation v. Dubno, 204 Conn. 137, 153 (1987). The credibility and weight of expert testimony is judged by the same standard and the trial court "is privileged to adopt whatever testimony he reasonably believes to be credible." Transportation PlazaAssociates v. Powers, 206 Conn. 364, 378 (1987). The trier of fact arrives at his own conclusions as to the value of real property by weighing the opinion of the appraisers, the claims of CT Page 14341 the parties in the light of all the circumstance in evidence bearing on value, and his own general knowledge of the elements going to establish value. O'Brien v. Board of Tax Review,169 Conn. 129, 136 (1975).
The court held hearings on this appeal of November 28, 1995, December 11, 1995 and December 14, 1995. Both parties submitted written appraisals, Defendant's Exhibit F and Plaintiff's Exhibit 1. The authors of these appraisals both appeared and testified. The plaintiff's appraiser was Joseph Rich of the International Appraisal Company. Defendant's appraiser was Donald Nitz of Donald J. Nitz Associates, Inc. Each appraiser qualified as an expert. Each appraiser has performed other tax-related appraisals for his client.
The plaintiff's appraisal which was dated February 3, 1994, concluded that the fair market value of the subject property, as of October 1, 1991, was eighteen million dollars ($18,000,000).
The defendant's appraisal dated October 10, 1995, concluded that the fee simple market value of the subject property as of October 1, 1991, was thirty-two million ($32,000,000) dollars.
The subject property is presently occupied by the owner being utilized for manufacturing purposes. It was so utilized on October 1, 1991. It is zoned Industrial IL-80 and IL30 so the present use is conforming. The site is improved with an industrial type building of mostly one and part two-story masonry and steel construction. The site consists of two parcels comprising 163.76 acres (Def. F.), 160.32 acres (Pl. Exh. 1). The major facility contains a gross building area of approximately 1,206,000 square feet with auxiliary structures approximating 61,000 square feet for a combined total of 1,267,000 square feet (Def. F), income approach, 1,197,340 square feet (Plaintiff 1), income approach. The facility was constructed in 1952. Maintenance has been performed on a routine basis and overall physical condition has been rated average/good (p. 43, Plaintiff 1). The property enjoys an excellent location which is accessible to major highways.
The court finds the highest and best use of the subject property is a continuation of its present use as an office/manufacturing facility suitable for either single or multiple tenant occupancy for the remaining economic life of the improvements. Plaintiff estimates the remaining economic life at CT Page 14342 fifteen years.
Plaintiff's appraiser testified that he considered three separate approaches to the value of the subject property: the cost approach, the income approach and the sales comparison approach.
Using the cost approach, he analyzed seven sales all subsequent to October 1, 1991 and all of considerably smaller parcels and concluded the subject acreage, 160.32 acres, was worth $40,000 per acre after adjustment or a total of $6,500,000. He established the total reproduction cost of the building at $61,126,047, depreciated them by 75 percent to arrive at a depreciated building value of $15,281,512 to which he added both the land value of $6,500,000 and a contributory value of site improvements of $4,000,000, arriving at a value by the cost approach of $26,000,000. In his final approach to value, he ascribed a weight of 15 (fifteen) percent to the cost approach to value method.
Defendant's appraiser rejected the cost approach for two reasons: he considered it unreliable due to the difficulty in accurately estimating reproduction costs and the effects of accrued depreciation; it was his opinion that a prospective purchaser of property of this type would give little or no consideration to this method of valuation in determining the price he would be willing to pay for the property.
Both appraisers offered opinions of value based on the income approach. Plaintiff analyzed five leases and two offerings in order to determine a unit rental for the subject property. Plaintiff's adjustment was quantitative performed on an adjustment grid with unit rentals of his comparables varying from 1.40 per square foot to 4.00 per square foot. After adjustment of these unit rentals, he valued them from $.81 per square foot to $2.10 per square foot. Based on these adjusted figures, the appraiser concluded the subject property would generate $2.00 per square foot unit rental. After making allowance for a vacancy allowance of 20 percent and operating expense including a 6 percent brokerage commission, the appraiser concluded the property could generate a net operating income of $1,743,327, which he capitalized at 10 1/2 percent to achieve an indicated value via the income approach of $16,500, 000.
The defendant appraiser analyzed nine leases for rentals ranging CT Page 14343 from $1.90 per square foot to $5.22 per square foot. Defendant's analysis was qualitative or judgmental rather than quantitative and resulted in an adjusted rental rate per square foot for the subject property of 3.00; multiplying this rate by 1,267,000 square feet resulted in a gross potential income of $3,801,000 on the subject property. After deducting a 7.5 percent vacancy loss and 3 percent cost of ownership expense, the appraiser determined the net income of the subject property would be $3,410,447. The appraiser determined an appropriate capitalization rate would be 10.50 percent which would result in market value of the subject property as of October 1, 1991 of $32,500,000.
The variance between the plaintiff's fair market value of $16,500,000 and the defendant's fair market value of $32,500,000 resulted of course because of the difference in projected rental rates of $2.00 per square foot versus $3.00 per square foot and the diametric difference in projected vacancy rates, the plaintiff's rate resting on the assumption of multiple tenancy and defendant assuming either a sale lease back single tenant or a lease to a single tenant. A further explanation of the difference, although of lesser weight, can be found in the 70.000 square feet of rental space missing from plaintiff's equation. Plaintiff's appraiser felt that in the main the auxiliary space would not justify the rental achieved by the manufacturing space.
Both appraisers used the sales comparison approach to develop a fair market value for the subject premises.
Plaintiff's opinion rested upon his analysis of seven sales and three listings. These comparables were mainly large properties, the smallest 214,000 square feet; the largest 1,332,933 square feet. Most of the properties were in Connecticut, two were outside of Connecticut. Before adjustments, the unit prices ($SF) varied from $8.40/S.F. to $37.81/S.F. including land. After being analyzed on a quantitative adjustment grid, the appraiser established an average selling price of 12.62 per square foot including land. Adjustments varied on the negative side from minus 3.20 percent to minus 59.50 percent.
Using this analysis, plaintiff's appraiser concluded that the subject property which he estimated had 1,197,340 square feet of usable building area would have a most probable selling price of 14.00 per square foot or $16,762,760, rounded off to $17,000,000.
Defendant's appraiser utilized the Direct Sales Comparison CT Page 14344 Approach to determine the fair market value of the subject premises. As was the case with plaintiff's appraiser, he selected sales data throughout the State of Connecticut in order to find comparables somewhat equivalent in size to the North Haven subject. The appraiser reviewed three sales and four current offerings. The sizes of these industrial properties varied from 211,450 square feet to 1,200,000 square feet. All of the properties were examined on a unit of comparison embraced in the sales price per square foot of gross building area inclusive of land.
The appraiser did not attempt to quantify the adjustments he made to these sales but used a method described as the Relative Comparison Analysis. He considered sales ranging from 17.84 per square foot to 39.60 per square foot and current offerings in the range of $18.34 to 34.82.
In his written report, he analyzed three sales. During the hearing he indicated that subsequent information on sale 3, Stanadyn, Inc. to Stanadyn Automotive Corp., February 3, 1989, caused him to place less reliance on this sale. The appraiser's final conclusion of fair market value of the subject property was that the appropriate unit value of the subject property was 25.00 per square foot which when considered in conjunction with the appraiser's opinion that subject property contained 1,267,000 square feet resulted in a value of $31,675,000, rounded to $31,700,000. Both appraisers agree that the Sales Comparison Approach usually provides the primary indication of value in appraisal of properties such as the subject property. Nevertheless, their respective estimates of fair market value based on the income approach produces approximately the fair market value based on the Sales Comparison Method.
Plaintiffs Defendants
Sales Comparison Approach 17,000,000 32,000,000
Income Approach 16,500,000 32,500,000
Final Estimate 18,000,000 32,000,000
The court's finding of the fair market or true and actual value of the subject property rests on its analysis of all the data submitted by both appraisers, but the finding is ultimately based on the sales comparison approach. The subject property is CT Page 14345 unique in its size. It contains 1,197,340 square feet of manufacturing space under one roof. It contains interior heights up to 28 feet and is located on a fully improved site of 163.76 acres. The property is well maintained and is excellently located with access to major highways. Plaintiff's appraisal contained only two properties which contained in excess of 1,000,000 square feet of manufacturing space: the Mack Truck property in Allentown, Pennsylvania, 1,184,701 square feet on 96 acres; and the General Motors property in Bristol, Connecticut, 1,332,933 square feet on 182+ acres. Defendant's appraiser submitted only one such property, the General Motors property in Bristol, Connecticut.
The court finds that the Mack Truck property has many elements which prevent it from having the weight required of a true comparable. It is a considerable distance from the subject property; it is older, has a poorer land-to-building ratio, and its utility is diminished in that space is distributed in six structures rather than concentrated under one roof in a single modern building. It also lacks the access to major highways present at the subject site.
The court finds that the General Motors ballbearing plant in Bristol, a comparable used by both appraisers, has all the elements required of a comparable to the subject property. It is located in Connecticut on a 182-acre site giving it a good land-to-building ratio, 5.95:1. It is a large, one-story building containing 1,332,933 square feet. The building itself is a modern manufacturing facility somewhat newer than the subject property. The fact that both appraisers used this property as a comparable even though it is a listing rather than a sale is significant. The present asking price of $28,000,000 is indicative of an asking price per square foot of 23.33 per square foot based on defendant's estimate of building area of 1,332,933 square feet. Plaintiff based his estimate of 21.01 per square foot on usable rental space of 1,200,000 square feet.
Defendant made no attempt in his written report to adjust this listing by the method of Relative Comparison Analysis. Plaintiff adjusted the listing price per square foot by minus 10 percent because of the difference in the effective age/condition between the subject property and the comparable and a further minus adjustment of ten percent because of the utility of the subject due to its superior ceiling heights. This resulted in an adjusted price for the comparable of $17.02 per square foot. CT Page 14346
The court concludes that the General Motors property in Bristol is uniquely equipped to serve as a basis for evaluating the subject property. The building is marginally superior in construction to the subject improvement, but the subject property location in the center of the state adjacent to major highways offsets most of the General Motors advantage in age and construction. The court concludes that if the sale price per square foot of this property is adjusted by 5 percent, the result would be a square foot value that is closely indicative of the true and actual square foot value of the subject property on October 1, 1991. This adjustment results in a per square foot value of the subject property of $19.95. Rounded to 20.00 per square foot and multiplied by 1,197,340 square feet which the court finds is the usable rental space in the main building of the subject property results in a true and actual value of the subject property on October 1, 1991 of $23,946,800 rounded to 24,000,000.
The property of the plaintiff was overvalued by the assessor as of October 1, 1991, causing aggrievement to it. The appeal of the plaintiff is therefore sustained, and it is further adjudged that the board of tax review correct the assessment against the applicant accordingly.
Dorsey, J. State Trial Referee