[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 2049
This action is a municipal property tax appeal filed by the plaintiff, Francis M. Cosgrove, on behalf of the owner of the property, 330 Main Street Associates Limited Partnership (partnership). Pursuant to a foreclosure action by a first lienholder, Cosgrove was appointed a receiver of rents on March 15, 1994 by order of the United States District Court for the District of Connecticut to collect the rents and operate the subject premises. On October 7, 1996, Cosgrove was discharged as a receiver, and on May 7, 1997, the partnership was substituted as plaintiff in this action by order of this court.
The subject property, 330 Main Street, is a three story multi tenant office building located at the northeast corner of Main Street and Charter Oak Avenue containing 43,956 square feet of gross building area.
In 1990, the partnership, in a previous tax appeal, challenged the valuation of the subject property on the grand list of October 1, 1989, the revaluation year. The partnership amended its appeal to include the grand lists of October 1, 1990 and 1991. The partnership and the city of Hartford entered into a stipulation for judgment on July 2, 1992 in which both parties agreed that the fair market value of the property on the list of October 1, 1989 and 1990 would be $6,153,500. The stipulation further provided that the fair market value of the property on the list of October 1, 1991 would be $6,100,000.[1] The stipulation also provided that "[t]he parties hereto stipulate and agree that the plaintiff, 330 Main Street Associates Limited Partnership may reserve its right to contest any valuation and/or assessment for assessment years subsequent to October 1, 1991." (Plaintiff's exhibit B.) Judgment was entered based on this stipulation on July 10, 1992.[2]
The plaintiff now brings this second appeal challenging the valuation of the subject property on the grand lists of October 1, 1995 and October 1, 1996. The parties agree that the valuation for the lists of October 1, 1995 and October 1, 1996 must be based upon the revaluation date of October 1, 1989. The appraiser for the plaintiff, Arnold J. Grant, and the appraiser for the city, Patrick A. Lemp, both trended back their valuation of the subject property to October 1, 1989. Both appraisers concluded that the highest and best use of the property was its continued use as an office building. We agree. CT Page 2050
Grant found the value of the property, as of October 1, 1989, to be $4,100,000. Grant used three approaches to value. He found the value using the cost approach to be $4,100,000, using the sales comparison approach, $4,730,000, and using the income approach, $3,750,000. Grant placed primary reliance on the income approach. In his appraisal report he stated that he placed no reliance on the cost approach.
Lemp found the value of the property to be $6,175,000 as of October 1, 1989. Lemp also used all three approaches to value, finding the value to be $6,300,000 using the cost approach, $6,000,000 using the sales comparison approach, and $6,050,000 using the income approach. Lemp gave equal weight to the income approach and cost approach, and gave least weight to the comparable sales approach because of the extensive adjustments required to the four comparables chosen by Lemp.
Although Grant placed no reliance on the cost approach, it was the cost approach valuation figure that ended up as his final estimate of value. Under the cost approach, Grant found the value of the land on October 1, 1989, to be $1,340,000. The reason Grant rejected the cost approach, however, was because the owner of the property, in 1986, acquired the land from the Hartford Redevelopment agency for only $161,285. Grant theorized that "[o]nce the value of land was increased due to speculative pressure, it became financially impossible to recreate the subject property as a for profit venture." (Plaintiff's exhibit A, p. 32.) Grant fails to recognize, however, that when the owner acquired the land, the cost was subsidized by the redevelopment agency. It is the highest and best use of the land that affects value, not the cost of acquiring and redeveloping the land for future speculation. See The Appraisal Institute, The Appraisal ofReal Estate (10th ed. 1992) p. 294. It is obvious that Grant did not follow his own theory here because he found the value of the land to be $1,340,000, not $161,285. "The most reliable way to estimate land value is by sales comparison." Id., 78. Based on sales of land west of Main Street, Grant selected the midpoint range of sales with weighted average prices between $30 and $45 per square foot to arrive at a land value of $37.50 per square foot. $37.50 times the land area of 35,841 square feet equates to $1,344,038. Grant rounded this to $1,340,000. Of the nineteen land sales used by Grant, only two were located in the same B-2 zone as the subject. CT Page 2051
Using the cost approach, Lemp found the value of the land to be $1,970,000. Of the three land sales used by Lemp, two were purchased for the highest and best use as a parking garage, not an office building. The remaining sale used by Lemp was located on Sheldon Street, much further east of the subject. Lemp concluded, based on his three land sales ranging from $23.85 to $70.81 per square foot, that the value of the land was $55 per square foot, or $1,970,000.
We note that the parties to this action previously stipulated that the October 1, 1989 land value was $2,007,100. At the time of the stipulation, July 2, 1992, both parties had available to them all of the comparable land sales listed by both Grant and Lemp.
Grant concluded that, using the cost approach on October 1, 1989, the building had a value of $4,238,585; adjusted by $1,478,585 for physical, functional, and economic and environmental depreciation, leaving a balance of $2,974,691. Since the subject building was constructed in 1986, according to Grant's analysis, it sustained approximately a 30% depreciation in value during the first three years of the building's life.
Using the cost approach, both Grant and Lemp used the Marshall Valuation Service for cost estimates. Grant arrived at a total cost of improvements of $4,238,585. Lemp arrived at the same cost of improvements as of October 1, 1989, of $4,620,000. The basic difference between Grant's and Lemp's computations is in the value each attributed to site improvements and entrepreneurial profit. Grant used 5% of construction costs for entrepreneurial profit whereas Lemp used 10%. Another substantial difference between Grant and Lemp as to their final value of the improvements using the cost approach lies in their view of depreciation. Grant concluded that the subject building had a three year accrued depreciation of $1,478,585. Lemp's conclusion regarding depreciation was $275,000. Our view of the credibility of the process of valuations used by both Grant and Lemp leads us to accept and reject parts of each of Grant's and Lemp's analyses. Pursuant to the cost approach, we conclude that the land value on October 1, 1989, was $52.27 per square foot times 35,841 or $1,873,409, and the value of improvements was $3,833,945. We arrived at the value of improvements by taking the building costs at $3,525,000 and adding $311,450 for additional site, soft, and entrepreneurial costs. Our conclusion of the value of the subject property using the cost approach, as of CT Page 2052 October 1, 1989, is $5,707,354.
In using the comparable sales approach, both Grant and Lemp used as comparables 61-87 Huyshope Avenue and 90-104 Allyn Street. The sale price of 61-87 Huyshope was $99.15 per square foot of gross building area. Grant adjusted this price up 10% for date of sale to $109.07. Lemp adjusted this price up 30% to $128.90 substantially for location and condition. 90-104 Allyn Street had a sale price of $131.93 per square foot of gross building area. Grant adjusted this sale down by 20%, and Lemp adjusted this sale up by 30%. We agree with Grant that there are no perfect comparable sales to the subject property. However, reviewing the sales selected by both appraisers leads us to conclude that, using the sales approach, the value of the subject is $122.80 per square foot of gross building area (43,956) or $5,397,797.
Turning to the income approach, Grant valued the subject property at $3,750,000. Lemp valued the subject property, using the income approach, at $6,050,000. Grant used the discounted cash flow method over a five year period while Lemp used the direct capitalization of a stabilized one year operating statement. Both appraisers were close in developing the potential growth income of the subject on October 1, 1989. Grant's potential gross income in year one was $831,998. Lemp's potential gross income was $897,864. However, Grant developed net operating expenses for his first year of $373,722, whereas Lemp's net operating expenses were $234,144. Grant ended up with a net operating income for year one of $374,987. Lemp's net operating income for the one year was $665,827.
Given the fact that the income flow was stable since the owner occupied a portion of the subject property and the government leased the balance, the direct capitalization approach can be used to develop a value figure. See The Appraisal Institute, The Appraisal of Real Estate (10th ed. 1992) pp. 419-20. Both direct and discounted cashflow methods are market-derived and therefore produce similar values. Id., 421. We find that the potential net rental income on October 1, 1989, using a 5% vacancy and collection loss due to the fact that the owner occupant and government are stable long term tenants, was $899,971. This amount includes parking income of $47,000 per year. We find that the calculation of expenses for year one by Grant in developing his expense projections for the income approach more accurately reflects the market and contract CT Page 2053 expenses for the subject property. Given our selection of effective gross income of $899,971 and net operating expenses of $373,722 we arrive at a net operating income of $526,249. After considering the choice of capitalization rates utilized by the appraisers and the foundations given for these choices, we consider a capitalization rate of 10% to be appropriate. Using a net operating income of $526,249 with a capitalization rate of 10% results in a value of $5,262,490.
Our obligation in this case is to arrive at our own conclusion as to value "by weighing the opinion of the appraisers, the claims of the parties in light of all of the circumstances in evidence bearing on value, and [our] own general knowledge of the elements going to establish value." (Internal quotation marks omitted.) Xerox Corporation v. Board of TaxReview, 240 Conn. 192, 204, 690 A.2d 389 (1997), citing NewburyCommons Limited Partnership v. City of Stamford, 226 Conn. 92,104, 626 A.2d 1292 (1993); O'Brien v. Board of Tax Review,169 Conn. 129, 136, 362 A.2d 914 (1975).
Using the three approaches to value, we arrive at the following valuation for the subject property:
Cost approach $5,707,354
Comparable sales approach $5,397,797
Income capitalization approach $5,262,490
Considering these three approaches to value, we conclude that the value of the subject property as of October 1, 1989 was $5,455,880. The assessor shall correct the value in accordance with this decision on the grand lists of October 1, 1995 and subsequent years until the city of Hartford conducts a new city-wide revaluation of property. Accordingly, the plaintiff's appeal is sustained, without costs to either party.
Arnold W. Aronson Judge Trial Referee