[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case is an appeal from the tax assessment placed upon the ("the Property") owned by Bristol-Myers Squibb Co. (BMS) in Wallingford, Connecticut, pursuant to Connecticut General Statutes § 12-117a as amended for the years commencing October 1, 1995, 1996 and 1997 only. BMS alleges that ("the Assessor") assessed the Property as of Wallingford's last revaluation which occurred as of October 1, 1991, based upon theFair Market Value; land at $12,293,800; Buildings $133,049,200;Outbuildings $1,056,900 for a total of $146,399,900. Pursuant to Connecticut General Statutes § 12-62a(b) property in Wallingford is liable for 70% of its true and actual value determined by the Assessor.
The parties both argue that the standard of proof applicable in Tax Appeals are recited in the case Konover v. West Hartford,242 Conn. 727, 734-736 (1997) as follows:
 In a § 12-117a appeal, the trial court performs a two step function. "The burden, in the first instance, is upon the plaintiff to show that he has, in fact, been aggrieved by the action of the board in that his property has been overassessed." Gorin's, Inc. v. Board of Tax Review, 178 Conn. 606, 608, 424 A.2d 282 (1979); O'Brien v. Board of Tax Review, 169 Conn. 129, 131, 362 A.2d 914 (1975). In this regard, "`[m]ere overvaluation is sufficient to justify redress under [§ 12-117a], and the court is not limited to a review of whether an assessment has been unreasonable or discriminatory or has resulted in substantial overvaluation.'" Newbury Commons Ltd. Partnership v. Stamford, 226 Conn. 92, 104, 626 A.2d 1292
(1993); O'Brien v. Board of Tax Review, supra, 130-31; see also Hutensky v. Avon, 163 Conn. 433, 436-37, 311 A.2d 92
(1972). "Whether a property has been overvalued for tax assessment purposes is a question of fact for the trier." Newbury Commons Ltd. Partnership v. Stamford, supra, 104. "The trier arrives at his own conclusions as to the value of land by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value including his own view of the property." O'Brien v. Board of Tax Review, supra, 136. Only after the court determines that the taxpayer has met his burden of CT Page 15717 proving that the assessor's valuation was excessive and that the refusal of the board of tax review to alter the assessment was improper, however may the court then proceed to the second step in a § 12-117a appeal and exercise its equitable power to "grant such relief as to justice and equity appertains. . . ." See Gorin's, Inc. v. Board of Tax Review, supra, 178 Conn. 608; O'Brien v. Board of Tax Review, supra, 169 Conn. 131; see also Newbury Commons Ltd. Partnership v. Stamford, supra, 226 Conn. 104; Hutensky v. Avon, supra 163 Conn. 436-37; Hartford Hospital v. Board of Tax Review, 158 Conn. 138, 148, 256 A.2d 234 (1969); National Folding Box Co. v. New Haven, 146 Conn. 578, 585, 153 A.2d 420 (1959); Underwood Typewriter Co. v. Hartford, 99 Conn. 329, 332-33, 122 A. 91
(1923); Ives v. Goshen, 65 Conn. 456, 459-60, 32 A. 932
(1985). "If a taxpayer is found to be aggrieved by the decision of the board of tax review, the court tries the matter de novo and the ultimate question is the ascertainment of the true and actual value of the applicant's property." O'Brien v. Board of Tax Review, supra, 131. "If the court finds that the property has been in fact overvalued, it has the power to, and should, correct the valuation." Hutensky v. Avon, supra, 437.
The defendant argues the trial court has broad discretion to determine the true and actual value of the property and "has the right to accept so much of the expert testimony and the recognized appraisal methods which are employed as it finds applicable." First Bethel Associates v. Bethel, 231 Conn. 731,741.
BMS argues that the Property must be assessed and taxed according to 70% of its true and actual value under Conn. Gen.Stat. §§ 12-63, 12-62a(b). BMS argues the best way to establish fair market value is through market sales Sibley v.Town of Middlefield, 143 Conn. 100 at page 107.
The defendant argues that "Fair Market value is defined as the value that would be fixed in fair negotiations between a desirous buyer and willing seller. (Citations omitted). CarolManagement Corp. v. Board of Tax Review, 228 Conn. 23, 34.
The defendant further argues that the plaintiffs objection to their appraiser, Flanagan Associates Appraisal (Flanagan) on grounds that it is not a fair market value appraisal but rather a "value in use" appraisal should be rejected. The defendant points out further that Robert Flanagan (Flanagan) testified his value CT Page 15718 was fair market value and not "value in use". "It was his opinion that . . . any depreciation existing on subject property experienced by the current occupant would also be encountered by other potential users in this real estate market . . . we're just not looking at the present user of the subject property but of the potential user of the property." (June 30, 1999 Transcript p. 47). In that he did not base the opinion solely on its value to BMS it is a fair market value appraisal McGraw-Edison Co. v.Washington County Board of Assessment Appeals, 573 A.2d 248, 251, 132 PA. Cmwlth 437 (1990)." See Brief of the Town of Wallingford pp. 4 and 5). The plaintiff argues further that no consideration should be given to Flanagan's Report, Exhibit F, because it did not follow "normally appraisal techniques."
 "Consideration of highest and best use has been recognized by this court as a valid part of any fair market determination. Section 12-63 indicates that the standard for valuation is the Property's present true and actual value, which is synonymous with market value, actual value fair market value market price and fair value. . . . (Internal quotes and citations omitted.) Carol Management v. Board of Tax Review, supra, p. 34. ("[A]n assessment of land at its fair value, of necessity, regardless of the method of valuation, takes into account the highest and best value of the land"). As we said in State National Bank v. Planning Zoning Commission, 156 Conn. 99, 101, 239 A.2d 528 (1968), "[the `highest and best use' concept, chiefly employed as a starting point in estimating the value of real estate by appraisers, has to do with the use which will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate." Id. 34.
Flanagan testified that he considered the highest and best use to be continued use as a research and development facility (RD) by someone in the same or similar business. Patrick J. Wellspeak (Wellspeak) approached his opinion as to Fair Market Value by considering the Property's Highest and Best Use —As Vacant and Subject Property — As Improved, (Exhibit 6 pp. 18-19).
As vacant Wellspeak states that the property consists of a 177.2 acre site with a gently rolling topography and pleasing characteristics for a corporate facility. The property has all available utilities with adequate capacity to support development. Property is zoned which permits a variety of uses. CT Page 15719 "It is our opinion that a corporate headquarter or corporateoffice RD use of the subject best conforms with the character ofthe site." Wellspeak opines as vacant and to satisfy what he claims as the criteria to produce the greatest net return a corporate headquarters with millions of square feet for development is the highest and best use.
Wellspeak opines the Subject Property — As Improved to identify the highest and best use considered, which is the first step in the valuation process, a list of possible uses as follows:
 1. Use as a multi-tenant RD office building for biotech or pharmaceutical companies.
2. Use as a multi — tenant office building.
3. Use as a corporate office headquarter.
4. Use as a corporate owned RD/office building.
In Wellspeak's discussion of the Highest and Best Use Improved he states the next step in the valuation process is to identify likely purchasers. Given the size of the facility only a limited number of potential purchasers exist in the worldwide marketplace. They include Merck, Johnson Johnson, Pfizer, Smith Kline Beecham and Glazo (see Exhibit 6pp. 19-20).
Wellspeak essentially concludes that all potential purchasers would want their total investment to be less than the cost to build their own substitute. The discount they would require represents (a) external obsolescence with the Cost Approach: This obsolescence exists due to the limited market for a particular property; (b) the discount for differing space requirements represents functional obsolescence and (c) any facility not new suffers from some level of physical deterioration. Normal wear and tear of mechanicals, roofing, building exteriors, etc.
As a final conclusion after considering the above outlined criteria Wellspeak concludes that the highest and best use of the subject as presently improved would be a corporate RD officefacility. (Report Exhibit 6 p. 21).
During the course of trial the defendant Town of Wallingford stipulated to Wellspeak's land value of $12,400,000 (the Town's CT Page 15720 evaluation $12,293,800).
The first step the court must determine is whether the property is overvalued and, if the court makes that determination the court tries the matter de novo to ascertain the true and actual value of the property. Konover.
Flanagan's credentials include being the former assessor of New London, has appraised other pharmaceutical RD properties including Borroughs Welcome, Pfizer, Hoffman La Rouche and UpJohn.
Of the three approaches to valuation, Flanagan considered the sales approach but rejected it because as he testified he found no useful sales to have occurred in an acceptable time frame which had comparable characteristics to the subject property. Flanagan also rejected considering office buildings because the property was not an office building.
Flanagan also did not find any rental data to use in the Income Approach for valuation and this facility was an owner occupied property not normally built for rental.
Accordingly, Flanagan used the Reproduction Cost Approach because the building was relatively new and indicative of what someone would build now. Flanagan selected the actual costs instead of costs of the recognized manual Marshall Valuation Manual because with a special purpose property, manuals lose their reliability. The defendant argues when valuing a special purpose building actual costs if available and recent are appropriate.
Wellspeak testified that the reproduction costs were $180,000,000 which when trended to 1991 were $180,650,000. (See Wellspeak Report Exhibit 6 p. 37.) Flanagan used the Asset Balance of BMS, addendum of his Report Exhibit F as of 03/05/1998. Although the documents he reviewed totaled $187,858,000, since BMS had told Flanagan the actual costs were $180,000,000 he arrived at a more conservative figure of $158,600,000. (Exhibit 7 p. 91). Flanagan after finding the cost of the building applied physical depreciation of 6% based upon three years of existence to a 50 year economic life. On page 92 of the Flanagan Report he did a computation to reflect how he arrives at his Fair Market Value in 1991 of $168,911,000. (See Defendant's Post Trial Brief pp. 12-14). CT Page 15721
The plaintiff argues that "while we have recognized that proper deference should be accorded to assessor's valuation, we have never characterized such deference as a presumption in favor of the validity of the assessment. . . ." Stamford Apartments Co.v. Stamford, 203 Conn. 586, 589 (1987).
The plaintiff in this case attacks the testimony and report of Flanagan by calling the court's attention to the Daubert
Analysis cited in State v. Porter, 241 Conn. 57, 698 A.2d 739
adopted by our supreme court. The Daubert Analysis as pointed out in Porter attaches to scientific evidence not evidence of a real estate appraiser as the case may be. This court in LaVin Executorv. City of New Haven, (CV92-0338415S New Haven J.D. May 21, 1998) even accepted a review appraisal. Leary, the appraiser in that case, performed a technical desk review of the plaintiffs appraisal which was under the provision of Standard 3 of the Uniform Standards of Professional Appraisal Practice. The review process included:
1. Annotated reading of the appraisal report;
 2. Checking compliance with US PAP and applicable Supplemental Standards;
3. Testing of significant mathematical calculations;
4. Considering the adequacy and relevance of data presented;
 5. Considering the appropriateness of the methods and techniques used; and
 6. Considering the appropriateness of the analysis, opinions and conclusions.
The burden of proof is on the party claiming aggrievement to prove the assessor's valuation [is] not the true and actual value of the property MacLean v. Darien, 43 Conn. App. 169, 174.
The plaintiff argues that the nature and size of BMS facility place it in a category entitled limited market properties which are difficult to appraise and require special techniques. Wellspeak performed an extraordinary amount of research to support his opinion of Fair Market Value. In fact as pointed out by the plaintiff he took a number of extra measures to determine CT Page 15722 his opinion was an accurate fair market value. Wellspeak like Sullivan used a reproduction cost approach. However, Wellspeak used Marshall evaluation service cost guide. Sullivan used the actual costs reflected by the Asset Balance of BMS. Wellspeak also did a sales comparison approach. Wellspeak testified he did not only use Marshall's Valuation Service but tested market data. Wellspeak tested his replacement costs with Mr. C. John Noble (Noble) an experienced cost estimator. Wellspeak's costs were at or above Noble's costs.
The plaintiff argues that all of accrued depreciation must be deducted from replacement costs. (New) as adjusted for soft costs and site improvements to determine FMV to which the land must be added. Plaintiff argues the forms of depreciation that must be considered using the cost approach are: physical deterioration, functional obsolescences and external obsolescence.
Wallingford argues that Wellspeak concluded that the cost to replace BMS facility was $147,702,345. Wellspeak then added $3,600,000 for soft costs and $12,400,000 for land value for a subtotal cost of $151,302,345 to which he added $5,000,000 for site improvements for a total cost of $155,302,345. Wellspeak then deducted $10,137,257 for physical depreciation based upon effective age of the property for four years. Wellspeak then deducted $50,407,489 for functional obsolescence or 32.2%. He then deducted 5% for external obsolescence in the amount of $7,815,117. The total amount of depreciation adds up to $68,359,863 bringing his opinion of value down to $100,342,482 rounded to $100,000,000.
Wellspeak testified that Functional Obsolescence may be measured by the difference between Reproduction Costs (Exact Duplicate) and Replacement Costs (similar utility). Essentially functional obsolescence accounts for items that the market would pay only a portion of the cost. Plaintiff argues that functional obsolescence does not necessarily mean that the facility is out of date or obsolete. "It merely means that the market will not recognize all the costs incurred by the property owner because of the specialized nature of the improvements." Wellspeak deducted $50,407,489 to account for outstanding features in the BMS facility for which a buyer would not pay their full cost. In other words what a buyer would pay for its needs rather than what BMS in fact paid.
Wellspeak engaged the services of Noble to develop a CT Page 15723 conceptual estimate of the renovation costs which a potential buyer would plan on spending. Noble gave Wellspeak two estimates; one at $54,027,320 for a similar user and $65,604,000 for renovations by; a different user. From that figure Wellspeak deducted the physical depreciation so as not to take a double deduction. Wellspeak checked Noble's estimates with contractors to test his numbers and also examined sales of corporate facilities, comparing reproduction costs to sales prices to arrive at a ratio.
Wellspeak used a 5% deduction for external obsolescence (factors outside the property) such as market conditions and what a buyer would reduce the purchase of somebody else's facility.
Wellspeak did another test in his analysis. He researched two high quality corporate facilities then took their sale prices and compared them to their reproduction costs and found that comparable facilities were 55% to 56% of reproduction costs. He arrived at a value conclusion of $100,000,000.
Wellspeak did a sales comparison approach. He interviewed real estate professionals in RD and pharmaceutical space. By this method he arrived at a value of $137.50 per square foot for the gross area or $100,063,975 for the entire building.
The defendant argues that Wellspeak testified also that BMS reproduction cost was $180,650,000 and replacement costs new as $147,702,345 so that the functional obsolescence should be $32,947,655. "[Mr.] Wellspeak however, after taking almost $33,000,000 off the cost of Bristol-Myers for functional obsolescence takes off an additional $50,000,000 in more functional obsolescence, for a total of $83,000,000 worth of functional obsolescence on a building which was three to four years old and working perfectly for its intended purpose!" (Brief of the Town of Wallingford p. 17).
Wallingford argues that the sales of other properties to check how much renovations were done after purchase (Exhibit 6 pp. 31-35) were not research and development facilities, therefore should not be accepted in his analysis of functional obsolescence. The defendant asserts that Wellspeak ignored his highest and best use of the property which is a key of fair market value.
The defendant argued that with respect to the sales Wellspeak CT Page 15724 used in his report no renovations were shown to have been made and is hardly evidence to support the conclusion that renovations are always made when research and development facilities are bought. Wallingford persuasively argues that Wellspeak's analysis does not demonstrate any trend by owners of RD facilities to renovate every time they are purchased.
Another objection by the defendant to the court's determination of fair market value established by Wellspeak lies in his reliance on Noble's "conceptual costs of renovations." Wellspeak requested Noble to assume another large company like BMS or Johnson and Johnson is interested in buying the facility, what advice would Noble give. Wellspeak concludes that $50,400,000 worth of functional obsolescence should be deducted from a three to four year old building. Wallingford analyzes that there are numerous flaws in Wellspeak's reliance on Noble's report. First Wellspeak subtracted $50,407,489 from replacement cost. Noble based his reduction on the existing property and that Wellspeak should have deducted functional obsolescence from reproduction cost not replacement costs. Wallingford showed on page 21 of its Brief the following calculations:
Reproduction Cost New: $180,650,000
Less, Physical Deterioration: 12,568,550
Less, Functional Obsolescence: 50,407,489
Plus, Land Value: 12,400,000 _____________ Final Value: $130,273,961
Wallingford asserts that by using replacement cost Wellspeak incorrectly took more functional obsolescence than Noble told him existed, i.e., $22,977,655. Wallingford points out that Wellspeak testified that the difference between Reproduction Cost and his replacement cost includes tiles, carpeting, physical interior finishes and a different roof and shell.
Wallingford argues that Noble's conceptual costs and renovations are merely possibilities and that Wellspeak should have not relied on these costs to determine functional obsolescence. Wallingford stated that Noble described a conceptual estimate, without architect's details. He described estimates as predictions. CT Page 15725
This court agrees with the defendant in that the functional obsolescence is speculative in this case. A similar user would in all probability utilize an architectural plan of renovations to determine the functional obsolescence.
A similar user would be the most likely purchaser of this property and to attempt another market would in all likelihood be fruitless.
This court has endeavored to evaluate the disputed evidence and expert opinions in this case. The acceptance or rejection of the opinion of an expert witness is a matter peculiarly within the province of the trier of fact.
Whether a property has been overvalued is a question of fact. The trier of fact arrives at his own conclusions by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value and his own general knowledge of the elements going to establish value including his own view of the premises, Konover, supra, 734-736.
This court viewed the premises and was most impressed with the appearance and quality of the building and equipment. The cost analysis done with BMS's asset balance in the court's view is the most appropriate methodology in this case.
Notwithstanding the flaws pointed out by plaintiff of the Sullivan Report outlined in the plaintiff's brief, it serves as a valuable test regarding overvaluation claimed by the plaintiff. Sullivan's report evaluates the property higher than that of the Assessors.
The court has considered "whether the reasoning or methodology underlying is essentially valid and whether that reasoning or methodology can properly be applied to the issue of over-evaluation (see State of Connecticut v. Porter,241 Conn. 57, 64, 698 A.2d 739 (1997)) finds that the functional obsolescence is not valid or can it be applied in this case.
This court, accordingly having considered the voluminous evidence presented in many days of trial that the plaintiff has failed to meet its burden of proof that the assessor's valuation is excessive and that the failure of the Board of Tax Review to alter the assessment was improper. CT Page 15726
Accordingly, judgment is entered in favor of the defendant.
Frank S. Meadow Judge Trial Referee