[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The instant proceeding finds its genesis in the decennial evaluation of property in the City of Danbury (hereafter "City") in general and property in particular of the Union Carbide Corporation (hereafter "Carbide"), the date of which was October 1, 1987. The appeal initially was directed at the 1995 Grand List, and has been amended to include the 1996, 1997 and 1998 Grand Lists. Interestingly enough, no appeal was taken for the seven year period between 1987 and 1995. The significance of this inaction suggests more than mere indifference to this court.
The property in issue here is a one million three hundred eight thousand seven hundred twenty-one (1,308,721) square foot corporate headquarters building (hereafter "Headquarters Facility") standing on ninety-nine point five (99.5) acres of land located at 39 Old Ridgebury Road a/k/a 35 Briar Ridge Road in Danbury. The Headquarters Facility and the ninety-nine point five (99.5) acre parcel are surrounded by five hundred forty-six (546) acres of undeveloped land. There are, in addition, two alphabetically designated lots and the computer building so-called located on a four point two (4.2) acre parcel.
The headquarters property might be described by any number of superlatives: magnificent, state of the art, futuristic, to use but a few. Its architect, Kevin Roche, describes it as a quarter of mile in length and one-eighth of a mile in width. A complete description of the Headquarters Facility is found in the Respondent's Exhibit 7A videotape entitled, "The Headquarters Building," and the respondent's Exhibit 7 B, the certified transcript of the audio portion of that videotape. The tape is narrated by the architect and consists of thirteen pages, together with the certification. That narration is appended hereto and incorporated herein in its totality by reference as Appendix One.
In order to prevail in an appeal from the decision of the Board of Tax Review (the designation of that agency may vary from municipality to municipality), the court must find that the action of the board will result in the payment of an unjust and therefore illegal tax. Only then will relief be granted. BeaconHill Condominium Assn. Inc. v. Beacon Falls, 41 Conn. App. 249,253; citing therein Gorin's. Inc. v. Board of Tax Review,178 Conn. 606, 608; Grossomanides v. Wethersfield, 33 Conn. App. 511, CT Page 13419 515.
While the taxpayer bears the burden of showing initially that its property has been overassessed (see Sears Roebuck Co. v.Board of Tax Review, 241 Conn. 749), that burden need not be met by the appellant's expert appraiser or other witnesses, but instead the court must consider all the evidence including the town's evidence to determine if the property is overvalued. Once the appellant's initial burden has been met, the trial court, in fulfilling its duty of finding true and actual value, can accept or reject all or portions of testimony presented by the parties. Its role is not simply to determine which party's witnesses testimony is more compelling to determine which party wins or loses, but rather, to determine, based on all the evidence, the true and actual value of the property.
"[T]he ultimate question is the ascertainment of the true and actual value of the [taxpayer's] property. . . . At the de novo proceeding, the taxpayer bears the burden of establishing that the assessor has overassessed its property. . . . The trier of fact must arrive at his own conclusions as to the value of [the taxpayer's property] by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value. . . ." Ireland v. Town ofWethersfield, 242 Conn. 550, 557; Xerox Corporation v. Board ofTax Review, 240 Conn. 192, 204. (Citations omitted; internal quotation marks omitted.) Because a tax appeal is heard de novo, a trial judge is privileged to adopt whatever testimony he or she reasons to be credible. Sears Roebuck Co. v. Board of TaxReview, supra, 756; Newbury Commons Limited Partnership v.Stamford, 226 Conn. 92, 99; cf. Eichman v. J J Building Co.,216 Conn. 443, 452.
To summarize, "[T]he trial court hears the tax appeal de novo on the premise that, throughout, it is the taxpayer who bears the burden of establishing an overassessment and of persuading the trial court of the true and actual value of his property for assessment purposes. New Haven Water Co. v. Board of Tax Review,
supra, 166 Conn.[232] 234. The cases on establishing a true and actual value differ, however, depending on whether the taxpayer has met his initial burden of establishing that his tax assessment was excessive.
If the trial court finds that the taxpayer has failed to meet CT Page 13420 his burden because, for example, the court finds unpersuasive the method of valuation espoused by the taxpayer's appraiser, the trial court may render judgment for the town on that basis alone. On appeals by the taxpayer, [the court] has regularly affirmed such judgments without a showing that the town adduced affirmative evidence sufficient to demonstrate that the assessor's determination of market value was not unjust. See, e.g., Gorin's, Inc. v. Board of Tax Review, 178 Conn. 606,608-10, 424 A.2d 282 (1979); New Haven Water Co. v. Board of TaxReview, supra, 239-40.
If, however, the trial court finds that the taxpayer, in light of the persuasiveness, for example, of his appraiser, has demonstrated an overvaluation of his property, the trial court must then undertake a further inquiry to determine the amount of the reassessment that would be just. See O'Brien v. Board of TaxReview, supra, 169 Conn. [129] 131. It is in the context of such cases, namely, cases in which the taxpayer has met his initial burden of proving overvaluation, that [the court has] noted the trial court's discretionary authority to find value and has declined to assign presumptive validity to the town's assessment figure. Carol Management Corp. v. Board of Tax Review,228 Conn. 23, 36-37, 633 A.2d 1368 (1993); Newbury Commons Ltd. Partnershipv. Stamford, supra, 226 Conn. 103-105; Stamford Apartments Co. v.Stamford, supra, 203 Conn. 589-90." Ireland v. Town ofWethersfield, supra, 557-58. The City has raised aggrievement in its special defense, and while it has been rather casually treated in the course of trial, this court has substantial reservations about that aggrievement.
On October 1 of 1987, the Headquarters Facility was valued at two hundred ninety-four million eight hundred twenty-seven thousand four hundred ($294,827,400) dollars, the surrounding six hundred twenty-six (626) acres (respondent's aggregation) of land which excluded the computer property and other small adjacent lots at fifty-one million two hundred thirty-one thousand ($51,231,000) dollars, for a total valuation of three hundred forty-six million fifty-eight thousand four hundred twenty-eight dollars and fifty ($346,058,428.50) cents. On the List of October 1, 1988, the City separated the Undeveloped Land from the Headquarters Facility and valued the Headquarters Facility at three hundred six million eight hundred three thousand eight hundred fifty-seven ($306,803,857) dollars. The assessed value thereof when reduced by the seventy (70) percent standard becomes CT Page 13421 two hundred fourteen million seven hundred sixty-two thousand seven hundred ($214,762,700) dollars.
It increased the Headquarter Facility property valuation to two hundred ninety-five million one hundred sixty-seven thousand four hundred thirty ($295,167,430) dollars on the List of October 1, 1990, thus increasing the total valuation of the Headquarters Facility to three hundred seven million one hundred forty-three thousand eight hundred fifty-seven ($307,143,857) dollars. The assessed value thereof with the same standard of seventy (70) percent applied is two hundred fifteen million seven hundred ($215,000,700) dollars. There has been no change in the Grand Lists that followed the 1990 List.
The City retained the firm of Cole-Layer-Trumbull (hereafter "CLT") to perform the 1987 revaluation. The CLT representative who supervised that revaluation was an assistant vice-president, regional manager and senior/industrial appraiser named Harold J. Maddocks (hereafter "Maddocks"). At that time, he had something in excess of thirty years experience in the assessment and appraisal fields, including large corporate headquarters facilities. His experience and credentials included certifications in this state to perform and supervise revaluations, certification as a Connecticut municipal assessor, tenures as an assessor for four Connecticut towns, and active involvement in the revaluation of sixteen to eighteen communities here in Connecticut. This experience also included valuing other large corporate headquarters properties of similar magnitude to the Carbide headquarters, including the IBM property in Southbury, Connecticut, which CLT also valued in 1987.
He considered all three appraisal approaches in arriving at the valuation he placed upon the property, and testified about his analyses on each approach. Under the cost approach, he used a replacement cost of two hundred twenty-three ($223) dollars per square foot for the Headquarters Facility based upon the cost data and information he had available from IBM Southbury; other office properties; and substantial DATA PROVIDED BY CARBIDEEXECUTIVES themselves. He then applied the market and quality adjustment set forth in his notes. After the compilation of his cost values and applying the twelve (12) percent depreciation allowance, Maddocks reached a replacement cost indication of value of the Headquarters Facility, exclusive of the land and computer building, of three hundred five million two hundred twenty-three thousand and sixty ($305,223,060) dollars. His total CT Page 13422 value indication under the cost approach for the Headquarters Facility and surrounding land was three hundred sixty million ($360,000,000) dollars.
Carbide alleges that Maddocks never inspected or measured the property and that his cost approach incorrectly assumed that the building was about ninety-five thousand (95,000) square feet larger than its actual size. It says that Maddocks' value under the cost approach using the correct size would have been two hundred seventy-eight point seven million ($278.7) dollars — six (6) percent less than what Maddocks calculated. The fact is that this discrepancy had little significance in his analysis. First, CARBIDE'S REPRESENTATIVES TOLD MADDOCKS that the building area was one million four hundred four thousand three hundred sixty-nine square (1,404,369) feet. Second, the cost approach was not Maddocks' primary indication of value. Third, William Kinnard, one of Carbide's experts who performed "an Appraisal Review or an Appraisal Report Review," himself admitted that a difference among appraisers of even seven and one-half (7 1/2) percent is not at all significant in valuing a building of this size.
Maddocks also valued the property utilizing the income approach to value. He relied on a gross contract rent of thirty-five ($35) dollars per square foot, being paid as of the Valuation Date by Boehringer Ingelheim, a tenant in the Headquarters Facility. He reduced the thirty-five ($35) dollar per square foot gross rent to an estimated triple net rent of twenty-five ($25) dollars per square foot by subtracting ten ($10) dollars per square foot, which was his estimate for cost of services required for Boehringer's tenant space. He indicated that his estimate for cost of services was based on his knowledge and experience for similar office space, while his estimate of net rent was based on his experience in analyzing the relationship between gross and net rents for office space in the northeast. Finally, he asserted that his estimates of net rent and cost of services were substantiated by information obtained from the "M-58" forms which were the City assessor's compilation of rental income and expense statements completed by the City's commercial and office property owners. This information confirmed net office rent in the eighteen ($18) dollar to twenty-seven ($27) dollar per square foot range. He arrived at an indication of value in the range of three hundred sixty million ($360,000,000) dollars, using a ten (10) percent capitalization rate, which was a constant used in the Danbury re-evaluation CT Page 13423 project.
Maddocks stated that he primarily relied on the sales comparison approach to value. He used the December, 1986, sale of the Headquarters Facility and surrounding land and parcels for three hundred forty point five million ($340.5) dollars as a comparable sale as it occurred only nine months prior to the Valuation Date. His study of market sales confirmed a rapidly escalating market from December, 1986, through late 1987. He therefore made a time adjustment to the Carbide sale of five (5) percent, concluding that the indication of value using the sales approach was in the three hundred fifty-five million ($355,000,000) dollar range. His fair market value for the homestead facility of three hundred fifty-five million ($355,000,000) dollars must, of necessity, be reduced by the forty point five million ($40.5) dollars allocated to the undeveloped land and the ten point seventeen million ($10.17) dollars allocated to the computer building property in the December 29, 1986 purchase and sale agreement. Applying these adjustments, the valuation of the Headquarters Facility can be approximated at three hundred four million ($304,000,000) dollars.
The appellant vigorously attacks Maddocks' evaluation of the Headquarters Facility and all of the Carbide real estate. It claims that Maddocks admittedly relied exclusively on the sales approach, used the sale-leaseback price of the December 29, 1986 transaction between Carbide and Nevada Investment Holdings, Inc./Sunbelt Stores, Inc. Carbide would claim that that transaction was a sale-leaseback transaction as opposed to a sale as the City contends. It asserts that Maddocks never analyzed the agreement. In fact, he never saw it. It continues to claim that he allegedly used the costs of the IBM facility in Southbury, multiplied that by the reported square footage of the Union Carbide building, and then added the value of the vacant land and other properties. While the claim was made that there was no record verifying what was done and how it was done, the absence of such a record does not necessarily jeopardize his valuation.
Of no little significance is the impact of an October 22, 1987 meeting among Maddocks, James Barton and David Keating, Carbide's director of general services and manager of taxes, in this instance, property taxes respectively. At that meeting, and as a result thereof, Maddocks and Keating agreed to a fair market value in the range of three hundred fifty-five million CT Page 13424 ($355,000,000) dollars for the Headquarters Facility and the surrounding acreage. Carbide had a strong incentive to agree with that figure as it resulted in an annual tax savings of some six hundred thousand ($600,000) dollars. A substantial tax saving on the Danbury property was Keating's mission, as it were, on the issue of taxes in general and the revaluation in particular. He obviously satisfied that mission.
Maddocks was discharged by CLT and succeeded by a Daniel Thomas in November of 1987. Subsequent thereto, Thomas sent an assessment notice to Carbide, which notice was reduced by ten million ($10,000,000) dollars after Keating complained to him in mid-December that the valuation set forth in the notices was higher than the parties had AGREED TO in October. The court was intrigued to observe that at the time Keating appeared at trial, he appeared very uncomfortable, if not extremely nervous, as both a spectator and witness. He made a herculean effort to disclaim any such agreement. However, he was compelled to admit its existence and substance when faced with a writing memorializing that particular event.
The agreement, according to Maddocks, also contained a provision that Union Carbide would not appeal the assessment and that it was dearly understood and agreed that the assessed value would remain in effect throughout the entire period covered by the October 1, 1987 revaluation. This court does not accept the "waiver of appeal" provision of the agreement. However, that provision of the agreement on the assessed value remaining constant throughout the entire period, may well explain Maddocks' interpretation that Carbide agreed not to take an appeal of this assessment. The City has pleaded this agreement for a special defense of estoppel. An argument can certainly be made that the City has indeed established such defense.
In Connecticut, it is well settled that proper deference must be given to the judgment and experience of assessors. StamfordApartments Co. v. Stamford, 203 Conn. 586, 589, citing thereinConnecticut Coke Co. v. New Haven, 169 Conn, 663, 668. The law contemplates that wide discretion is to be accorded to assessors, and unless their action is discriminatory or so unreasonable that property is substantially overvalued and thus injustice and illegality result, their opinion and judgment should control in the determination of value for taxation purposes. StamfordApartments Co. v. Stamford, supra; Uniroyal Inc. v. Board of TaxReview, 182 Conn. 619, 633-34 n. 8. This deference should be CT Page 13425 accorded when either the assessor or the revaluation company representative who valued the property for the revaluation testifies at trial. Carol Management Corp. v. Board of TaxReview, 228 Conn. 23, 36. This court has no difficulty in finding that Maddocks' opinion of value is reasonable and accurate as is his methodology as it existed or occurred in this case. His assessment of three hundred four million ($304,000,000) dollars for the subject property as well as the highest and best use thereof, is accepted as fair, just and reasonable.
Each of the parties offered a seeming plethora of expert witnesses and, as might be expected, the appellant supported and corroborated its "lead" appraiser. The respondents, in turn, followed the same tactic. Each of the parties spent considerable time and effort and, at certain times, exasperation in attempting to discredit each other's witnesses.
Carbide retained Edward F. Heberger, a well known, respected and experienced appraiser in these cases, who in the course of his career has testified for both sides (municipalities and appellants) in respective tax appeals. At the time the appraisal was accomplished, Heberger and a gentleman named Champagne were engaged in an appraisal business and the testimony disclosed that most if not all the field work and the report was accomplished by Champagne. It was never established that Heberger had in fact utilized the time and effort to adopt it as his own, although prior to that disclosure he appeared to offer that position.
The appellant also retained the services of William Kinnard to conduct a review appraisal or "Appraisal Review or an Appraisal Report Review" as he phrased his undertaking with respect to Heberger's report. He too offered an impressive curriculum vitae. His value, his opinions and his expertise are called to question when it was disclosed, in the course of the trial, that he was provided with a copy of Heberger's appraisal before the final draft was submitted. He analyzed that appraisal, made several suggestions, many of which were substantive, returned them to counsel, and amazingly, Heberger's final report contained most if not all those corrections, including a reduction value of some fifteen million ($15,000,000) dollars.
While his qualifications are impressive to say the least, his actions herein together with his extensive criticisms of the respondent's experts which ultimately became recognized and admitted as being his PREFERENCES AS TO WHAT THE STANDARDS SHOULDCT Page 13426BE AND HOW THEY SHOULD BE INTERPRETED AS OPPOSED TO WHAT THOSESTANDARDS ARE IN FACT AND HOW THEY ARE INTERPRETED subjected his opinion to substantial criticism. This, together with his aversion to splitting infinitives and his propensity to split hairs, diminishes and negatively impacts his credibility as an expert and value as a witness.
The City retained the services of John J. Leary as its appraiser in this appeal. He too seemed eminently qualified as an expert in his field. The court, to be sure, again notes in passing that these experts frequently find themselves on opposite sides in these appeals and other litigation. The profession seems to be an interchangeable fraternity and witnesses are hardly reluctant to offer opinions which often contradict previous testimony or positions taken in other litigation.
Perhaps the most controversial aspect of this litigation and indeed the linchpin thereof is the transaction between Carbide and Nevada Investment Holdings, Inc./Sunbelt Stores, Inc. which occurred on December 29, 1986. It was termed a "sale-leaseback" and consisted of the Headquarters Facility, the Linde Data Center and five hundred twenty-six point five (526.5) acres of undeveloped land. The purchase price for the total package was three hundred forty million five hundred thousand ($340,500,000) dollars allocated as follows: land, fifty million six hundred seventy thousand ($50,670,000) dollars; ten million one hundred seventy thousand ($10,170,000) dollars for the office and computer building land; one million eight hundred forty thousand ($1,840,000) dollars for lots F and H; and thirty-eight million six hundred sixty thousand ($38,660,000) dollars for the undeveloped land. At the same time, Carbide formed a joint venture with the related companies to develop the undeveloped land. In May of 1987, Nevada/Sunbelt transferred all the property it acquired in the sale to Danbury Buildings, Inc. (hereafter "DBI") its successor in interest for no consideration.
That allocation continued by valuing depreciable property other than real property at sixty-two million four hundred twenty-seven thousand seven hundred sixty-six ($62,427,766) dollars; improvements (including the corporate office building, garage and Linde building) two hundred twenty-seven million four hundred two thousand two hundred twenty-four ($227,402,224) dollars; and other non-depreciable property ten ($10) dollars.
The appellant never produced an itemization of the CT Page 13427 "depreciable property" transferred. Heberger's report summarily described the sixty-two point five million ($62.5) dollars as "personal property," and he deducted that amount from the price to arrive at an "adjusted" price for the real property component of the transaction of two hundred thirty-nine million four hundred twelve thousand two hundred twenty-four ($239,412,224) dollars. Heberger made no investigation to determine whether this "depreciable property" in fact personal property. He reached no opinion on the reasonableness of the allocation. However, the drafter of the Heberger report, Paul Champagne, questioned the reasonableness of allocating this amount to personal property.[1] Had he investigated the allocation, Heberger would have discovered the following facts. First, the lease agreement specifically states that personal property owned by Carbide "shall belong to it." This language reveals the clear intent of the parties that no transfer of personal property from Carbide to DBI take place. Second, the November 6, 1986 letter of intent between Carbide and its original intended buyer made no mention of personal property, and stated that the purchase price for the real property to be conveyed was three hundred million ($300,000,000) dollars. Third, the personal property filings of the appellant and DBI on October 1, 1986 and October 1, 1987 show that Carbide reported a higher
valuation of personal property in 1987 than it had in 1986, and that DBI reported approximately three point seven million ($3.7) dollars in personal property in 1987. These filings are quite inconsistent with the notion of a transfer of sixty-two point five million ($62.5) dollars in personal property to DBI in December, 1986.
The reality is that the parties to the sale set up this sixty-two point five million ($62.5) dollar allocation to allow DBI (formerly Nevada/Sunbelt) to claim a short depreciable life of this portion of the purchase price for income tax purposes. Carbide's claim, and Heberger's unquestioning acceptance of it, that the price must be reduced by sixty-two point five million ($62.5) dollars, finds no support in the proof.
Carbide contends that this transaction was a financial transaction and certainly not a sale that might well establish a fair market value for the property. The City's position is that this sale-leaseback is a legitimate sale and therefore evidence of the fair market value of the property. The fair market value is by definition the price that a willing buyer will pay a willing seller based on the highest and best possible use of the land, assuming, of course, that a market exists for such optimum CT Page 13428 use. "Fair Market Value" is synonymous with "market value, actual value, market price and fair value." Carol Management Corp. v.Board of Tax Review, supra, 34, citing therein Mazzola v.Commissioner of Transportation, 175 Conn. 576, 581-82.
In this appeal, Carbide claims that this transaction was part of restructuring plan which was established to deal with the potential liabilities associated with the December 3, 1984 Bhopal disaster, the ensuing decline of the Carbide stock price, and the hostile takeover attempt by GAF, which it was able to defeat at great expense. Because of these factors, it continues that it was forced to sell the land and improvements for more than it was actually worth. Its goal was to raise three hundred million ($300,000,000) dollars.
The City is suggesting that this position is a sham tailor-made for this litigation and unsupported by the evidence. It claims substantial support from certain documentation which it discovered and exposed in the course of the trial. In its 1986 Annual Report distributed in early 1987, Carbide told its shareholders that adequate provision had been made for probable losses associated with Bhopal, and that such ultimate outcome after provisions therefor would not have a materially adverse effect on the consolidated financial position of the corporation. The chairman's letter to stockholders in the 1986 Annual Report outlined Carbide's successful restructuring program. He described how Carbide elected to take on substantial debt in January, 1986, in order to fend off the GAF takeover attempt and then repurchase most of that debt in December of 1986 with, among other things, proceeds of divestitures of certain divisions occurring in 1986.
After lauding Carbide's accomplishments in 1986, the chairman concluded, "We have moved beyond the problems of the past two years and look forward to further progress."[2] Two valued members of the corporation James Barton and Thomas Jones, who in 1986 and 1987 were Carbide's director of general services and the assistant treasurer, respectively, offered evidence that Carbide was under duress at the time of the sale and needed to raise at least three hundred million ($300,000,000) dollars in cash from the sale of the Headquarters Facility.
On cross-examination by the City, however, they both conceded that in a 1992 Florida lawsuit brought against Carbide by DBI, that they had filed affidavits in support of Carbide's defense, that it was NOT in desperate need for funds from the sale. As CT Page 13429 Barton said in his affidavit, "Thus it is clear that UCC did not first approach DBI's predecessor as alleged in the complaint. DBI sought out UCC. Nor was UCC desperate for the funds "to avoid a default on its debts," as DBI also alleges following an earlier aborted transaction. The earlier planned sale and leaseback involving Drexel and Pfizer had indeed fallen through, but that was only because UCC had rejected new conditions sought to be imposed by Drexel.
Although UCC desired the cash it would receive in the sale and leaseback transaction, it was not facing default on its debts. In December, 1986, when the lease was signed, UCC had just concluded arrangements for a three point one billion ($3.1) dollar credit facility, an equity offer for thirty million (30,000,000) additional shares and a two hundred million ($200,000,000) dollar private placement and had ample funds available to it. Had DBI's predecessor walked away from the deal, UCC would have resumed the negotiation with Drexel and Pfizer, which UCC had broken off, or waited to do the deal with someone at a later time. UCC was simply NOT in the desperate state "DBIsuggests."[3] The City in its brief titles Carbide's position in this litigation as well as in the DBI litigation as "different purpose different story." That characterization strikes this court as being extremely accurate.
In support of its position on the transaction, Carbide offered the testimony of one Stephen Corrick, a tax expert with impressive qualifications, who appears to be heavily involved in leasing transactions. He indicated that an investor in sale-leaseback transaction evaluates three primary factors or risk areas in deciding whether or not to invest in such a transaction. The first of those primary factors or risk areas is the performance risk (will the lessee make payments, i.e., the credit of the lessee); the second is the tax risk (will the transaction be treated for tax purposes the way the parties intend); and third, the expected residual (the value remaining in the property at the end of the lease). He agreed with the testimony of the parties to Carbide's sale-leaseback transaction "that the purchaser on a sale-leaseback is NOT looking at the fair market value of the underlying property when deciding the terms of the sale and the lease. He also agreed with Shepherd Johnson, the president of DBI, that tax issues would be of vital importance to the seller and buyer of Carbide's property. He, of course, opined that the transaction was a sale-leaseback transaction which was a financial transaction. While this court chooses to extract the CT Page 13430 foregoing from his testimony, it is not suggested that it was anything less than extensive, and from Carbide's point of view, completely supportive of its position in this appeal. (N.B. Carbide's point of view.)
In support of its position that this sale-leaseback transaction was a sale as opposed to a financial transaction, the City called upon Martin Stauffer, a certified public accountant, and a business assurance partner in the firm of Pricewaterhousecoopers, LLP, who described the business partner as one basically involved with and concerned with the auditing of financial statements of companies. He reviewed the documents in this sales-leaseback transaction, the mortgage, some of the offering material from Security Pacific's marketing brochure of the property and "a whole host of documents." His review of the subject documents and the transaction itself indicates that it was treated by the appellant as a sale and not as a financing transaction. He entertained the same opinion with respect to income taxation aspects of the transaction, He agreed with the manner which this transaction was treated by Carbide on its financial statements, which manner supported his opinion.
There are rules as to how a seller and a buyer should treat a sale-leaseback transaction on their respective financial statements. These rules are promulgated by the American Institute of CPA's and the Financial Accounting Standards Board (hereafter "FASB"). Its purpose is to provide two-fold guidance to accountants and auditors, both independent CPA firms as well as companies, to provide guidance as to how transactions should be reported and to lay out a set of rules to determine when a transaction should be treated as an operating lease and a sale as against a capital lease and a financing transaction.
FASB Rule 13 is the applicable standard and it provides that if a transaction is treated as an operating lease and a sale, as opposed to a capital lease or financing transaction, it is indeed a sale. There is no debt, there is no obligation to repay. The contractual obligation to pay rent in the future is no different from any other lease. It is not the equivalent of financing from an economic prospective. If the transaction is treated as a sale, the seller-lessee is allowed to treat the rental payments as an annual operating expense and not as long term debt on its balance sheet. One of the FASB Rule 13 criteria is that the present value of the minimum lease payments must be less than ninety (90) percent of the fair market value of the property as of the date CT Page 13431 of the transaction.
Corrick's contradictory testimony that the market value is not a factor that either the IRS or the parties to a sale-leaseback consider, was effectively undermined not only by Stauffer but by IRS rules and other authoritative publications introduced through Stauffer and Heberger. Corrick offered no opinion on the financial accounting aspects of a sale-leaseback under FASB Rule 13. The IRS questions the parties' characterization of a sale-leaseback as a sale (which allows the party to claim interest expense and depreciation deductions as the owner of the property) if the purchase price exceeds the fee simple market value of the property or the contract rental exceeds the market rent for the property.
The parties to the sale took several steps to keep the purchase price and rental rate at or below market, in order to achieve the financial and tax benefits summarized. The Security Pacific Marketing brochure sent out to potential bidders emphasized that the appellant would pay an initial MARKET RENT of twenty-one ($21) per square foot net. The letter of intent signed by Carbide to its initial proposed buyer in November, 1986, made explicit its intent to qualify the lease as an operating lease for sellers' purposes. To justify the purchase price, Carbide and its initial proposed buyer, obtained the appraisal by Marshall and Stevens which, at the risk of being redundant, valued the Headquarters Facility and surrounding seventy-five (75) acres (twenty-four point five (24.5) acres less ninety-nine point five (99.5) acres) valued by the City (as of December 1, 1986) at three hundred twenty-two million ($322,000,000) dollars, well above the actual allocated purchase price and the City's valuation of the property nine months later. Incidentally, that appraisal also determined that the base net market rental of twenty-one dollars and eighteen ($21.18) cents per square foot was slightly above the base contract rental setup in the lease of twenty-one ($21) dollars per square foot net.
Carbide succeeded. Stauffer agreed with its characterization of the transaction as a sale on its financial records. Without any contradictory testimony from Carbide, Stauffer testified that Carbide met all four EASB Rule 13 standards for treating the transaction as a sale.[4] The sale met applicable IRS standards including, without limitation, that based on the contemporaneous Marshall and Stevens report, the purchase price did not exceed fair market value and the contract rental did not CT Page 13432 exceed market rent.[5]
The clear weight of the evidence is that Carbide did what it needed to do to ensure that the purchase price for the property in December, 1986, did not exceed its fair market value, and that the contract rent spelled out in the lease did not exceed market rent. It's about face position in this case, that the purchase price and contractual rent were significantly ABOVE market, is typical of its different purpose, different story motif, and is unsupported by the evidence.
The appellant cites several decisions from the courts of other jurisdictions which challenge the validity of the accuracy of the value placed on a sale-leaseback transaction. Connecticut has yet to offer an opinion from its highest court on that issue. There is one coordinate case in the state which does indeed question reliability utilizing the value set forth in these transactions in terms of comparable sales. See Corbin-Russwin,Inc. v. Town of Berlin, judicial district of Hartford/New Britain at New Britain, Docket No. CV94-0461772 S (February 7, 1996, Handy, J.). Although this court has great respect for that court, it is constrained to disagree with that holding in this particular case. It does on these facts in this case and theCREDIBLE EVIDENCE find that this sale-leaseback transaction is a reliable and valid measure of value when applying the sales comparison approach.
Heberger, Carbide's appraiser as aforesaid, prepared a fee simple appraisal of the headquarters property using all three approaches to value, as well as an estimate of the lease fee market value based upon the actual rental amounts paid under the leaseback agreement. In his appraisal, he analyzed the Fairfield County office market and noted that while the office market was still active in 1987, vacancy rates were rising and absorption levels were slowing. He concluded that the Carbide building was not designed for multiple tenants although it could probably accommodate a few large corporate tenants.
The pods in the building were constructed on costly concrete piers which would be cost prohibitive to many developers/uses and concluded that the pod structure was not as cost effective as a single or several large rectangular shaped buildings. In his cost approach, he used both replacement[6] cost and reproduction[7]
approaches. The replacement cost (new) using the Marshall Valuation Service adding soft costs, site improvements, deducting CT Page 13433 physical depreciation (nine (9) percent) and external obsolescence totaled one hundred eighty-nine million six hundred fifty-four thousand three hundred six ($189,654,306) dollars. Reproduction cost (new) totaled three hundred six million two hundred thirty-eight thousand five hundred seventy-one ($306,238,571) dollars, as compared with replacement cost of two hundred thirty-three million six hundred eighty-six thousand three hundred six ($233,686,306) dollars, before deductions. He reconciled this difference by calling it "functional obsolescence," as the replacement cost figures assume a more efficient design, and October, 1987 materials and construction techniques.
In his sales comparison approach, he relied on sales of office buildings in excess of one hundred thousand (100,000) square feet in Connecticut and Westchester County between 1984 and 1988. His specifically excluded sale-leaseback transactions, sales of high-rise office buildings within the central business districts of cities, and syndications of real estate. He concluded that such sales are not comparable in the case of a sale-leaseback transaction and syndications are not a true arm's length market transaction as they are financing vehicles.
He refused to consider the sales-leaseback transaction which occurred in December of 1986 as not being indicative of the market. Those comparables that he found for non-leaseback properties, which were sold during the period in question, were all smaller than the subject properties, requiring downward adjustment in price as compared with the subject. This was necessary as selling prices PER SQUARE FOOT of smaller buildings tend to be higher than prices of larger buildings. He also recognized that four of the five comparable properties were designed for and occupied by multiple tenants, whereas the subject property was designed specifically for Carbide as a single user. After making the appropriate adjustments for the differences and characteristics of the comparable sales as compared with the subject property, he concluded that the fee simple market value of the subject property, using the sales comparison approach, was one hundred eighty-five million ($185,000,000) dollars.
In his income capitalization approach, he utilized two assumptions. The first of which was that the premises were occupied by a single user, and the second was that the property was leased to several large users over a forecast absorption CT Page 13434 period. Using Carbide's actual contract rent paid, he concluded that the lease rates generally averaged twenty-one ($21) dollars per square foot on a gross basis (plus electricity) for a single user.
He claims to have confirmed that number with supportive data as indicative of the market on October 1, 1987. He allowed an eight (8) percent vacancy and collection loss allowance. He estimated pro forma stabilized operating expenses (excluding real estate taxes) using a capitalization rate of nine point two (9.2) percent and a tax loaded rate of ten point three five (10.35) percent developed from market sales as well as the Band of Investment technique. He concluded the most probable value estimate using the income capitalization approach was one hundred sixty-five million ($165,000,000) dollars. On his second assumption, he assumed several large users rather than a single user because only very limited number of users could utilize the entire facility effectively. Using a discounted cash flow approach, he estimated the property value at one hundred fifty-three million ($153,000,000) dollars.
In his leased fee valuation, he used Carbide's actual contract rent paid in accordance with the lease. Based upon the assumptions that were described in his report, the property was estimated to have a leased fee market value of two hundred twenty million ($220,000,000) dollars. In terms of excess rent, he developed a cash flow using the same parameters as the leased fee analysis, but using market rent rather than contract rent. The discounted difference between those approaches using contract and then market rent equals thirty-seven million ($37,000,000) dollars. He concluded, however, that it was inappropriate to add this to the final value estimate for tax purposes, primarily because it is considered to be an intangible asset.
After reviewing all the valuation data, he concluded that the final estimate of the fee simple market value of the subject was one hundred eighty-five million ($185,000,000) dollars, without considering the previously mentioned problems with his appraisal as absolutely controlling. His appraisal is not persuasive. Kinnard, true to his commission, recited that Heberger's appraisal was supportable in virtually every respect. As anticipated, the only disagreement he had with the report was that it might over state value.
Leary, the City's appraiser, is severely criticized by CT Page 13435 Carbide for several reasons. Some of that criticism has already been ruled upon as being without merit, and the court will not set forth Carbide's claims and the court's ruling a second time. Leary reached valuation of the property at three hundred million ($300,000,000) dollars, using the reproduction cost approach. The December of 1986 appraisal by Marshall and Stevens, prepared in connection with the sale, contained a detailed trended reproduction cost estimate. Leary trended that cost estimate to October 1, 1987, added a modest percentage for entrepreneurial profit, and then deducted six point two five (6.25) percent for physical deterioration. He found no functional obsolescence and no evidence of external obsolescence as of the Valuation Date. He then added the value contributions from the site improvements and the site itself to arrive at a range of value of two hundred eighty-five million ($285,000,000) dollars to two hundred ninety-seven million ($297,000,000) dollars. He explained in detail his analysis and conclusions regarding the reproduction cost approach in his direct and cross-examination. Leary's analysis makes sense and is quite consistent with the appellant's statements close to the Valuation Date on the attractiveness and utility of the Headquarters Facility.
It must be remembered that Heberger concluded that the building suffered from over seventy-two million ($72,000,000) dollars in functional obsolescence and thirty million ($30,000,000) dollars in external obsolescence. His position is hardly consistent with many statements made by the appellant, its agents and the architectural profession between 1982 and the Valuation Date. He had to confess that he made no attempt to consult with the project architectural corporation which features the headquarters building in its client brochure. He also failed to consult the architectural and trade journals which critically acclaimed this world class signature facility. He never saw Carbide's videotape in which the project architect explained his goals in designing the Headquarters Facility as a self-contained unit easily accessible by employees with each of the fifteen office pods adaptable to stand on its own as a separate building until the time of trial. The Carbide videotape spoke at length about the beauty, accessibility and adaptability of the building which is declared to be one of the most "successful office environments ever built in America."
He never read the Security Pacific marketing brochure produced and distributed for the appellant in mid-1986. That brochure recited that the Headquarters Facility "has received CT Page 13436 critical acclaim in business and architectural journals as one of the most significant structures completed in recent years. It is a striking building with a unique layout that is both practical and flexible." It also cited a survey of Boehringer-Ingelheim employees who give the headquarters facilities "very positive" marks on its design, layout, attractiveness, and accessibility. Once again, one of Carbide's key executives, James Barton (who was then the director of general services, and was in charge of the Headquarters Facility's operation), testified that the operating systems of the building were "marvelous" and that the building was "beautifully designed," "Class A plus," "a city within a city." Ironically and inconsistently, the very attributes of the Headquarters Facility that the appellant highlighted in 1986 and 1987, are now claimed by its appraiser and other witnesses to be the root of the building's obsolescence as of October 1, 1987. Here, as well as elsewhere in the case, it might well be said that Carbide is hoist on its own petard. Again, the City's words provide the logical conclusion, the appellant "wants it both ways."
Leary contradicted the appellant's experts as to methodology in the ultimate valuations. To reiterate, the appellant, of necessity, unleashed a full scale attack upon Leary's report and his testimony. Perhaps, what it considered the strongest attack, involves what it claims is a failure to comply with significant provisions of the Uniform Standards of Professional Appraisal Practice (hereinafter "USPAP"). Incidentally, Leary was one of the principal drafters of USPAP. The criticisms fall under three general categories: the first of which is that Leary did not sufficiently verify certain information contained in his report; the second is that Leary did not sufficiently analyze or discuss various conclusions in his report; and third, that he was biased and compromised his professional independence by "manipulating data" to defend the City's valuation.
The appellants draw upon USPAP Standards Rules 1-4(b) with respect to verifying information. That standard provides the verification shall occur when applicable, and the appraiser must collect and verify, analyze and reconcile, specific data in the report. The term "Verified" is not defined in USPAP. The appellant, therefore, attempts to define the term "verify" to its own satisfaction and advantage. It goes without saying that Leary was not able to verify ALL information in his report. USPAP encourages the use of direct excerpts from current appraisal reports in performing a retrospective appraisal such as the one CT Page 13437 in this case. Nothing in those standards even suggests that it is improper for an appraiser to use and consider data from appraisal reports for the property owner during the precise time period relevant to the retrospective valuation, much less that such appraisals be admissible in appeals such as this.
The second general objection is that he did not sufficiently "analyze" or "discuss" certain conclusions in his report. The appellant's counsel's disagreement with Leary's analysis is not evidence and does not overcome Leary's analysis as violative of USPAP. The court has already referred to Kinnard's testimony and his preferences or interpretation of the standards initially offered as standards themselves as being clearly refuted. Without progressing any further, if appellant's counsel's extreme unsubstantiated interpretation of "self-contained report" is accurate, then Heberger's report is as great a nullity as Leary's is claimed to be.
Now, as to the claim of bias, Leary effectively refuted that assertion and stated that he made the same proposal to value the subject property in response to a solicitation of his services by the appellant's counsel for whom he has undertaken several assignments over the years. He has never once compromised his independence to suit the needs of any client including the appellant's counsel.
The Leary report recognizes that the income approach is most useful in the valuation of income producing (investment) real estate. It analyzes the contract rent which Carbide was paying. It therefore places primary reliance on the income approach pursuant to his lease on which over NINETEEN YEARS remained as of the Valuation Date. He concludes that the contract rent on the Carbide lease as of Valuation Date was equivalent to a market rent for similarly large single tenant-owner-user office facilities. He applied a market derived capitalization rate range of seven (7) to eight (8) percent to the market rent and discounted cash flow (yield) rate of nine (9) to ten (10) percent of the remaining contract rent. His report arrives at eight indications of value used in the income approach ranging from two hundred eighty-five million ($285,000,000) dollars to three hundred twenty-five million ($325,000,000) dollars.
The criticism of Leary's report continued by claiming that he, Leary, also used the reproduction cost approach (that is estimating the cost in creating an exact replica of the CT Page 13438 Headquarters Facility as of the Valuation Date) because a potential buyer of the property would not have seriously considered producing a replica of Carbide in 1987, given the allegedly declining market conditions as of this date. The evidence clearly indicates that the market was not declining in 1987.
The Leary report declares that he appraised the retrospective market value of the fee simple interest in Carbide's corporate headquarters reflecting market conditions as of October 1, 1987. In reaching his value conclusion, he complied with USPAP's requirement that he consider the net purchase price for the property and the rental payments negotiated in the sale. The investment value" (i.e., capitalization of the actual rental stream a property is generating) is highly significant in determining the fee simple market value when the property, as in this case, is devoted to its highest and best use in generating its maximum possible income. See Uniroyal, Inc. v. Board of TaxReview, 174 Conn. 380, 388-89.
Leary also used six corporate headquarters sales as comparables in his sales comparison approach. He found that the real estate market established a sub-market for corporate facility sale-leaseback transactions. In his search for sales of corporate headquarters facilities during the relevant time period and the transactions he found were sale-leasebacks. This use of an appropriate sub-market is an authorized and accepted appraisal practice. The Appraisal Institute Treatise expressly authorizes the use of either or both qualitative and quantitative analyses of sales comparables depending upon the particulars of the appraisal assignment.
Leary chose the qualitative method because each corporate office/corporate headquarters facility is unique and a quantitative sales adjustment process would be speculative. His purpose in using the qualitative approach was to "bracket" the sale of property. This approach permitted him to determine whether the net purchase price per square foot of the property was within the range of sales prices per square foot for the six other corporate headquarters comparable sales that he utilized. He concluded that the purchase price of the property fell within the "market brackets established by the comparable sales." Thereafter, he conducted a detailed analysis of the sale itself to Nevada/Sunbelt Stores, Inc. and determined that the purchase price of the property was a valid indication of its market value CT Page 13439 nine months later. That determination withstood the attack made upon it.
The claim that Leary made no adjustments for the financial characteristics of each comparable sale, and that he failed to make quantitative adjustments because the dates the six transactions were one to three years before the Valuation Date is not supported by credible evidence. He did take, in fact, the financial characteristics and other aspects of the sales into account in arriving as qualitative adjustments. In addition, the great weight of the evidence shows that the market values continued to rise through 1986 and 1987. Thus, any time adjustment of the sales price per square foot of the earlier transactions would have to be upward to account for the higher market values as of the Valuation Date.
The appellant claims that Leary was absolutely unwilling to recognize the changes in the marketplace as of January 1, 1987, and continues that he could point to no sale-leaseback transactions after December 31, 1986. It also asserts that the Tax Reform Act (hereafter "TRA") of 1986 puts such transactions out of business. The City, in response, contends that the appellant has missed the fundamental point. It claims that the issue for the appraiser in valuing any corporate headquarters property is not whether a potential buyer would enter into a sale-leaseback transaction, but whether and how much the potential buyer would pay to purchase the fee simple interest in the property. It concludes that argument by saying even Kinnard conceded this basic principle.
Leary thoroughly examined the effect of the TRA of 1986 on the market after December 31, 1986. He examined his own appraisal files, the appraisal files of other appraisers as well as the appraisals Heberger himself conducted during this particular time period. He found that corporate headquarters facility, as indicated previously, such as this became more attractive in 1987 to investors who were looking for deals with economic substance to them. He found that the pattern of corporate headquarters sales identified in his report, which were available to an appraiser as of the Valuation Date, indicated that most of the transactions, including the sale, occurred in the fourth quarter of the year. Therefore, as of October 1, 1987, there was no evident trend showing that sale-leaseback of corporate headquarters facilities would not occur in the fourth quarter of 1987. CT Page 13440
Heberger, however, in his report, in his analysis of market rent, refused to consider rental rates from leases of large corporate headquarters facilities. He used as rental comparables, buildings which did not even approach the size as the Headquarters Facility and had nowhere near the amenities that the Carbide building offered. Despite the dissimilarity of these transactions, he insists that the market rent data was a gross plus electric basis in contrast to the clear weight of market data showing that rental rates for large headquarters facilities during this time period were absolute net (tenant pays all expenses). Both he and Kinnard refuse to give weight to the absolute net contract rent which Carbide was paying under the lease. Disregarding the rent paid by the appellant under this sale-leaseback arrangement, is clearly repugnant to our Connecticut cases. See Uniroyal, Inc. v. Board of Tax Review, supra, 174 Conn. 388-91; Federated Department Stores, Inc. v.Board of Tax Review, 162 Conn. 77, 83; see Grossomanides v.Wethersfield, supra, 514 n. 4.
The court in Uniroyal noted that labeling a sale-leaseback of a corporate headquarters facility as a "financing," is irrelevant to the valuation of the parcel for assessment purposes. The court recited that whether the instrument in question is a lease or different sort of agreement is not determinative of the question of whether the amounts specified in the lease could be properly capitalized to determine the property's value. The basic question is whether the property is producing its maximum income.Uniroyal, Inc. v. Board of Tax Review, supra, 388-91; quotingFederated Department Stores, Inc. v. Board of Tax Review, supra, 83. The quote went on to state that as a general principle earning or income producing capacity as distinguished from actual earnings is to be regarded as a factor in valuation for tax purposes, but if the property is devoted to the use for which it is best adapted and is in a condition to producing or is providing its maximum income, the actual rental is a very important element in ascertaining its value.
Section 12-63b of the General Statutes, which was amended in 1984, requires that in determining a property's "market rent," the assessor and therefore the court, in determining the fair market value of the property, must consider both (1) net rent for comparable properties and (2) the net rent derived from any existing leases on the property. First Bethel Associates v.Bethel, 231 Conn. 731, 740. Neither the previously cited Uniroyal
CT Page 13441 or Federated cases stand for the proposition that contract rent should be considered to the exclusion of market rent in arriving at the fair market value of income producing property. The court did hold, however, that under the particular facts of those cases the actual rental income was "a significant factor" in determining what a potential buyer would pay to acquire the property. The court also upheld the trial court's finding based on the town's expert's report that the contract rent was equivalent of market rent. Uniroyal, Inc. v. Board of Tax Review, supra, 390-91. It also rejected the argument that the contract rent in that particular case should not be factor in the valuation because it was significantly different from the market rent. First Bethel Associates v. Bethel, supra, 740-41. This court is satisfied under Uniroyal and section 12-63b, that both actual and market rents must be considered and the weight given to each depends on the facts of the particular case.
Each of the experts do agree that the highest and best use of the property as of the Valuation Date Was its then current use, i.e., single tenant/owner user. It is also agreed, at least by implication, that the property was fully leased and was generating its "maximum income"as of the Valuation Date. The contract rent specified in Carbide's lease is therefore entitled to significant weight in this court's determination of the fee simple market value of the property as of October 1, 1987. The significance of the contract rental stream to the court's valuation of the property is underscored by Leary's conclusion that the contract rent of twenty-one ($21) dollars per square foot net was equivalent to the market rent of the property as of the Valuation Date.
Leary's conclusion is corroborated not only by the appellant's 1986 marketing brochure that offered the property at "market rents of $21 per square foot net," but by market data in the two 1986 appraisals on the property. The appellant claimed that the greater Danbury vacancy rate in the third quarter of 1987 would be higher than the Fairfield County rate for this period if approximately one hundred twenty-five (125,000) thousand square feet of space, which Carbide sought to sub-lease in 1987, were added to the available Class A in greater Danbury for the third quarter of 1987. Leary demonstrated to the appellant's surprise during his cross-examination that if the vacant Carbide space is added to the total available Class A in greater Danbury in the third quarter of 1987, the one point three (1.3) million total square footage in the Headquarters Facility CT Page 13442 must also be added to the total Class A office space in greater Danbury. By doing so, the total Class A office space vacancy rate is greater in Danbury in the third quarter of 1987, declines from five point five (5.5) percent to three point five (3.5) percent. Both Leary and Heberger (in his early appraisals of properties in the Danbury office market with effective dates of October 1, 1987) agreed that the vacancy rates as of October, 1987 in greater Danbury were low, that there was a healthy demand for office space. Contemporaneous office market surveys published during that time period show that the cap rates were decreasing and market rents and market values were increasing from 1986 through the Valuation Date, thus corroborating Leary's report and Heberger's EARLIER APPRAISALS IN OTHER CASES.
While it is true that Class A vacancy rate in Fairfield County increased by three point three (3.3) percent from the fourth quarter of 1986 to the third quarter of 1987, the appellant's reliance on this data is misplaced. The Cushman and Wakefield Office Market Survey contained this data as well, but that report is solely on multi-tenant office properties. To reiterate, the Headquarters Facility was a single tenant/owner user facility as of the Valuation Date. The market demand began to switch in 1987 from multi-tenant speculative space to investment created properties like the Headquarters Facility that generated positive cash flow and had long-term low-risk leases in place. That fact alone, permits the court to attach considerably less significance to vacancy rates in Danbury and Fairfield County, as of the valuation dates, which would tend to blunt this aspect of the appellant's case. Carbide was occupying approximately eighty-five (85) to ninety (90) percent of the space as of the Valuation Date, and intended as of that time to continue occupying the vast bulk of the space for at least the five year period.
This appeal is somewhat unique. To summarize, in addition to the Maddocks' valuation for single tenant/owner user as highest and best use, and Leary's valuation of the Headquarters Facility, the sale-leaseback transaction which this court chooses to recognize as a sale, and two independent appraisals at approximately the same time, all support this court's finding. The first of those two independent appraisals was the Cushman and Wakefield report as of February 28, 1986, which appraised the headquarters parcel and sixty-five (65) acres more or less at two hundred sixty-five million ($265,000,000) dollars. The second, the Marshall and Stevens appraisal as of December 1, 1986 was CT Page 13443 three hundred twenty-eight million ($328,000,000) dollars. This court cannot accept Carbide's explanation of the purposes of these appraisals. Each of these appraisal firms is a well known, highly respected and most reputable firm. Each has certified its work. A dismissal by Carbide of these appraisals as having no significance or being conducted for different seemingly misleading purposes fails to impress and, in fact, lends greater credence to the City's accurate portrayal thereof as "difference purpose, different story."
The court is satisfied that the Maddocks' valuation, the Leary appraisal, together with and the other valuations, is indeed accurate and clearly reflects the value of the Headquarters Facility as of the Valuation Date of October 1, 1987. It finds that the true and actual value of the property to be three hundred four million ($304,000,00) dollars, seventy (70) percent of which computes to two hundred twelve million ($212,000,000) dollars. Initially, the court had substantial questions about Carbide's aggrievement and therefore its standing to bring this appeal. It remains unconvinced that Carbide is indeed aggrieved.
Judgment may enter, accordingly, dismissing the appeal.
Moraghan, J.
APPENDIX ONE
 Transcript of Video Tape "The Headquarters Building" 19:00
Voice of Mr. Kevin Roche:
The design of any good building responds to these three things: it responds to a program and it responds to the site of the environment in which the building is built and it responds to the technology of the time. I was particularly impressed with your approach to the matter of programming because in some corporations the chairman of the board or the head of the building committee will tell us what the program is, but you took an entirely opposite approach to that and really a much more democratic approach. You said let the program emerge from the people who would use the building and that's exactly what CT Page 13444 happened. We did interview about 184 people in great detail and that together with the responses which we got from the different components was the basis for the program.
Your building which was designed in the 50's reflects the thinking of the time. Changes in space requirements were made by moving petitions but moving petitions is very expensive. In recent years it cost as much as one and a half million dollars. A much larger cost, of course, is lost time, disruption of the people and general irritation. The primary reason for moving petitions is to make offices larger or smaller according to the rank of the occupant. But what goes on in an office is similar, regardless of the great classification, such as processing paper, telephone calls and small meetings. Top management challenged this tradition, the component representatives challenged it, and we challenged it also. If all offices were the same size, then instead of moving petitions around, we could achieve flexibility just by moving people. There were also many comments on the furnishings and general reactions against status symbols. Whether or not for instance you have a corner office or an office in the center or whether you get a wood wall or a settee or a marble coffee table. Most people felt that it would be sensible to cut back on these things. In addition, some people pointed out that the furniture wasn't particularly functional. This, for example is hardly the best designed unit in the world. Many people asked for more conference rooms both large and small with better equipment. Another widely expressed desire was to have as few interior offices as possible. Everyone likes an outside view and we like to provide a better working environment for all employees, including those who don't have private offices. It also faced this problem: haphazard copy-making equipment. It's unsanitary, rather dangerous and uses a lot of energy. We recognized that if we didn't include it in the plans, it would crop up again as before. Also, the question of environmental control. Ideally, everybody would like to be able to control the temperature and the light in their offices. And then there was a general comment: we'd like a less institutional building, one that is warm, friendly and uses a wide variety of colors and materials. So those were the kind of comments that we got and tried to respond to. After a lot of experimentation with full size mock-ups, we found that a thirteen-and-a-half by thirteen-and-a-half foot square office would work very well and would satisfy all of the requirements that we set out. You could furnish it, let's say with a desk around which four people could sit, a back counter, and because the room is square, the CT Page 13445 furniture could be arranged on any of the three walls. Or the furniture could consist of a conference table and a desk, or in the same size room, you could put a conference table for eight or ten people, which was another popular request. In addition, this size room will accommodate two people very well, with enough space for files and for at least two other people visiting.
Offices, however, are only one of our needs. We must have elevators, stairs, toilets, conference rooms and a resource center for mail delivery, duplicating, stationary supplies and communications devices. Copy stations might also go into the resource centers. Since these elements don't need windows we put them on the south of the building. But this means devoting more room to support services than would be justified by the number of offices. So we have to search for a different way to group the offices and we start by adding on from twelve to eighteen to twenty-four to thirty-six. But now the ratio of exterior wall to the interior is increasing and this is a problem because exterior walls are one of the most expensive elements in a building. So to keep the exterior wall at a minimum without sacrificing volume, we developed two different office shapes. They are the same size exactly, but one is a square and the other is a wedge. The final layout houses a total of eighty people in approximately twenty-two-and-a-half thousand square feet. The next question was whether these units should be arranged in separate buildings such as a campus or whether they should radiate out from an administrative center. The second approach seemed more appropriate to the management philosophy and the present organization. This is how such a building arrangement might look. But, when you put in the parking you face the terrible reality that there is a need for about 2,900 cars so that we have moved out of the city and into the center of a parking lot. Something has to be done. We took one more look at the underground parking with a garage underneath the whole structure. The total expense for this approach, however, would be prohibitive, so we explored the possibility of putting the garage inside the building. This is the beginning of an actual building concept. The two gray areas are the parking, central space would be dining and other central services and the offices would be on the outside. As the building is now designed, our engineers have calculated that it's perhaps the most efficient building of this size and scale that's been developed to date.
Narrator:
CT Page 13446
Three seasons of the year you can hardly see it. Amidst the rolling green Connecticut hills, you catch but an occasional glimpse of Union Carbide's home. In the heart of this wooded setting, left relatively undisturbed by the building and its access roads, Union Carbide's World Headquarters is all but hidden from view. But climb into a blue Connecticut sky, and you begin to get an idea of the magnitude. It's as if you've taken a giant skyscraper and laid it on its side a quarter of a mile in length, as long as the Empire State Building is high, an eighth of a mile wide.
This is how a typical day starts, with a morning commute. Environmentally, the concept was to put up a totally contained unit not surrounded by acres of parking lots. To accommodate the commuter, the building was designed with indoor parking on four levels. Carbiders simply drive in over the north or south bridges and park outside their office sections.
The architects designed a series of fifteen office sections, each four stories high, where each component could be on its own virtually in its own building. There are nine large sections and six smaller ones. Each section has its own stairwells. The nine larger ones also have elevators. The north and south wings, identical in area and facilities, are connected by the Center Core, where most of the administrative services and conveniences are located. Here in the sections, Union Carbide adopted the concept of equal office space. All of the 2,350 offices are identical in area, though not in shape. Most of the offices are square, but there are some that are wedge-shaped. Each office has about the same amount of window space looking out upon the scenery. The offices are protected from the sun by reflecting glass awnings and have their own heat and air conditioning controls. Carbiders are given a choice of fifteen different styles of office furniture, each with two color selections, and decors ranging from modern to traditional. For meetings, conference rooms are conveniently placed throughout the sections.
Many secretarial stations are equipped with word processing systems for electronic storage, editing and printing of documents. Some office sections even have their own word processing centers. With word processing, the sections can be linked to other units in the building or to Carbide offices around the country and abroad through electronic mail.
Large sections have administrative support centers, which are CT Page 13447 connected to the building's electro-mechanical mail delivery system. Many are equipped with copier and facsimile machines, and each has a hot and cold beverage pantry and supply closet.
Now that we've shown you what goes on in the sections, the individual offices, conference rooms, and administrative support centers, let's take a look at Center Core. To orient you properly, we'll show you a map of some of the key areas of Center Core, then take a more detailed look at some of its more interesting features.
Center Core serves the entire Headquarters, much as administrative support centers serve the sections. It stacks in one central area all the services essential to supporting the activities of both the people and the business of Union Carbide. The ability to use the latest communications technology is one of the operating concepts of this building. As we look at the Center Core, you'll see the impact of advanced communications, video, special meeting techniques and the computer.
From the main gate you've been through the reception lobby at ground level with indoor parking nearby. The ground floor is also home for the mailroom, security, a fitness center, the computers for the Unicom telecommunications system and the television studio. When you think of video, you think of entertainment or news. But a corporation like Union Carbide uses video for a wide range of business communications.
Nearby is the mailroom, where some 70,000 pieces of mail are processed daily. That's equivalent to serving a town with a population of 20,000 people. Since this building is so spread out, an electro-mechanical mail delivery system utilizing two-and-a-half miles of track and motorized trolleys are used to connect the forty mail stations throughout the building with the central mailroom. Each of these carts is identified with a magnetic coding device. When they are sent on their way to any of the sections, their progress is monitored by this control panel.
Computers are being used to increase the effectiveness of systems throughout Headquarters. This is most evident in telecommunications. Unicom, a computer-based worldwide telecommunications system, makes it easy for people at Headquarters to be in instant touch with Carbide locations throughout the U.S. and overseas. CT Page 13448
 "Union Carbide, good afternoon."
To give you an idea of the magnitude, over 35,000 calls go in and out daily. This telecommunications system also provides worldwide access to mainframe computers through telephone lines. A series of data terminals link 850 Carbide locations for messages via CRT, teletype or word processor. An electronic mail system allows instant transmission of administrative information, financial data and customer order and shipment records. The way is open for even more sophisticated linkage between the computer and the telephone in the future.
Computers are also a vital part of the building's security system. CASS, a central alarm station on the ground floor, is the nerve center for the Headquarters' security force. It links all the building's audio and visual communications systems.
From the ground floor, we move up to the first floor. Here's a series of conference and training rooms, a telephone and message center, and mezzanine lounge. It also contains the graphic and audio-visual services departments. The most noticeable feature of the first floor is the conference center. Here conference rooms range in size from capacities of eight to fourteen to an auditorium which will seat up to 140. The meeting rooms are equipped for video playback, film and slide projection and audio teleconferencing.
From the conference center on the first floor, we continue to the second floor. Here we find the Unicore Store, a notions shop, the cashier, money machines, and an information center. Also located here is the medical department, corporate library, and law library. This small news and notions shop sells newspapers and magazines and those important little odds and ends for daily living. The Unicore Store features a wide variety of items, including many of the company's products. It's like a small department store, and it's well stocked.
Across from the company's store is the medical department. It's staffed and equipped to handle emergencies, periodical physical exams, testing, medical referrals and fitness and health programs.
Automatic banking machines dispense cash. Its computer interface arranges to debit an employee's own account. And company cashiers keep money and airline tickets moving. CT Page 13449
Now that you've seen the employee conveniences, let's take a look at the business services offered on the second floor. If you think this library is just a collection of books and periodicals, then take a second look. This, too, is a product of the computer age. The corporate library, like its neighbor the law library, can access hundreds of data banks around the country. Through computer terminals, they can summon up almost any piece of business information that's needed. The library also has microfiche readers and printers.
The third floor of Center Core is dedicated to food. The kitchen is flanked by the main cafeteria, where employees can find a wide variety of quality foods in a pleasant and varied atmosphere, and the west cafeteria which features a special salad bar. In the kitchen, a talented staff turns out an astonishing array of dishes. Everything is prepared on site, down to pies, cakes and pizza dough. Feel like a sandwich? A choice of main dishes, hot soup, your own salad concoction. It's all here. Not only is there a wide range of foods, but there's also a choice of six specially designed dining areas. Take your pick. Skylights. Fountains. A fireplace. From the west cafeteria, a view of the countryside. In addition to serving the Headquarters staff for breakfast and lunch, these rooms can be converted to elegant locations for corporate receptions and dinners with gourmet food all prepared on site.
When the weather is nice, employees can work off all that good food by taking a brief walk on the fitness trail. The trail is also very popular with runners after working hours. There's also a fully equipped fitness center on the ground floor with showers and locker rooms.
The last area of Center Core to see is the fourth floor which serves Carbide's senior management. Located here is the board room, a management information center, three special meeting rooms and the conference dining suits. This is the reception area outside the board room and the management information center. The management information center is especially designed computerized conference room for upper management presentations. In here is the board room. Let's take a look inside. Union Carbide's board of directors meets ten times a year, mostly in this room. It features the latest in communications capabilities, rear screen video, film and slide projection and audio playback. A central computer controls all the audio visual devices for this room, the CT Page 13450 management information center and three special meeting rooms. There are also conference dining suites on this floor. Here, meals prepared in the main kitchen are served for special meetings.
Union Carbide's Headquarters. The location is Danbury, Connecticut, but the thinking is worldwide. In the words of the building's architect, Kevin Roche: [Roche speaking] "The principles we kept in mind were that the corporation was really composed of people. We tried to create a building that would be orderly, sensible, friendly and useful, as pleasant an environment as possible, open and free, really forward looking technologically because we thought that would be the best way to express what Union Carbide really is."
Narrator:
Forward looking. That's the thrust of this building. This World Headquarters. A building designed to give Carbiders the working environment and support they will need to conduct business in the coming decades. Union Carbide's World Headquarters in Danbury. The building is finished. The future begins.
 [end of videotape]